**WILLAPOINT OYSTERS, Inc. v. EWING,**
Administrator, Federal Security
Agency, et al.

No. 11936.

United States Court of Appeals
Ninth Circuit.

April 29, 1949.

Rehearing Denied June 3, 1949.

680

Albert E. Stephan, of Seattle, Wash. (Grosscup, Ambler & Stephan, of Seattle, Wash., of counsel), for petitioner.

Alexander M. Campbell, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty., of San Francisco, Cal. (John T. Grigsby, Atty., Dept. of Justice, and William Goodrich, Atty., Federal Security Administration, both of Washington, D. C., of counsel), for respondents.

Before STEPHENS, BONE, and ORR, Circuit Judges.

BONE, Circuit Judge.

This matter is before us on a petition for judicial review of two so-called "Final Orders" of the Federal Security Agency, hereafter referred to as Agency, prescribing and establishing standards of identity and a standard of fill of containers for canned oysters. The First Final Order was issued March 10, 1948, by Respondent Ewing, Federal Security Administrator, hereafter referred to as Administrator, and published in Federal Register March 13, 1948 (13 F.R. 1337-1339). The Second Final Order was issued August 3, 1948 by Respondent Kingsley, Acting Federal Se-

curity Administrator, and published in Federal Register August 12, 1948 (13 F.R. 4663-4664). These orders, which purport to establish regulations of general applicability, will be referred to as the First and Second Orders.

Petitioner, a Pacific Coast packer of canned oysters, filed with this court its petition for judicial review of the First Order and in this petition sought injunctive relief against enforcement of the order of March 10th and an order remanding the proceedings to the Administrator to take further evidence respecting its method of "blanching" oysters which it uses in its commercial canning operations. It was represented to this court that this "blanching" method of treating canned oysters had been "commercially developed" subsequent to the close of the record upon which the Administrator based his First Order of March 10th.

Being persuaded, on the record before us, that the showing made by petitioner presented reasonable and just ground for granting the petition for remand, this court on June 8, 1948, ordered that the proceeding be remanded to the Administrator with directions to take such additional evidence (and evidence in rebuttal thereof) as petitioner should offer relative to the new process it employed to pack "blanched" oysters, the hearing to be held within 30 days of the date of the order, on reasonable notice to petitioner. We further ordered that after considering such additional evidence, the Administrator might modify his findings as to the facts or make new findings by reason of the additional evidence taken, and file with this court such new or modified findings, together with his recommendations, if any, for the modification or setting aside of his original (First) order along with the return of such "additional evidence." 21 U.S.C.A. § 371(f).

The Administrator conformed to this mandate and pursuant thereto a further hearing was timely held on July 7 to 12, 1948 before a presiding officer designated by respondent Ewing. Thereafter and on August 3, 1948, respondent Kingsley, as Acting Administrator, signed the so-called "Second Order" by which relief was again denied to petitioner. New (supplementary) findings on the new evidence adduced at the hearing ordered by this court were reported back to this court, the supplementary findings being made by Kingsley during the absence from duty of the Administrator. Thereafter petitioner caused the entire record upon which both orders had been made to be presented to this court for consideration, review and determination of the validity of both orders and the findings and conclusions upon which they rest.

Both Final Orders were promulgated under the provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 341, and they establish and promulgate new "definitions and standards of identity," and new "standards of fill," for canned oysters. As to the matter of "fill," the orders require that *all* oyster packers shall conform to a standard under which the "drained weight" of *all species* of oysters packed in all sizes of cans shall be not less than 59% of the water capacity of the can. As respects standards of identity, the orders require that petitioner's product shall be labeled "Pacific Oysters." (The requirement of a 59% "fill" means that the can (see footnote 3) shall contain approximately 6-½ ounces of oyster meat at the time it reaches the consumer. See calculations on weight of oysters and water capacity, infra.)

The foregoing requirements are challenged on this review as "unlawful" under each of five enumerated legal standards set by the Administrative Procedure Act 5 U.S.C.A. § 1009(e). The specific contentions are set forth at a later point.[1]

The real substance of petitioner's challenge appears to be epitomized in its contention that compliance with the two orders would (a) compel the Western type of oyster to be henceforth *only* identified as "Pacific Oysters" while the Southern type of oyster would enjoy the name "Oysters";

---

[1] Jurisdiction to review the aforesaid orders is conferred by the Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 371(f). The term "Agency" means the Federal Security Agency, 21 U.S.C.A. § 321(c).

The term "Administrator" means the Federal Security Administrator, 21 U.S.C.A. § 321(d). See also historical notes to Sections 321 and 392 of Title 21.

(b) destroy a long-continued use on its labels of the generic term "Oysters" and thereby transfer to Southern oyster canners the exclusive use and good will of that term and (c) destroy petitioner's "quality pack" by requiring an excessive quantity of its (larger) Western oysters to be crammed into a can with resultant discoloration, disfiguration, distortion and breakage.

In order that the numerous contentions of petitioner be brought into proper perspective we are obliged to refer to previous and formal steps taken by the Administrator to establish regulations covering certain practices in the oyster canning industry. Specifically, these activities of the Administrator relate to formal regulatory proceedings before him in 1944. The order and regulations resulting from the 1944 proceedings are discussed more fully infra.

The record on this review also contains data and arguments offered by petitioner relating to certain official declarations and actions antedating the 1944 regulatory proceedings before the Administrator, and these are thought by petitioner to support its position here.

A fair consideration of these pre-1944 matters and the argument based on them persuades us (so far as a fill of container standard is concerned) that the subsequent proceedings had before the Administrator in 1944, and the regulations formally and lawfully adopted and promulgated as a result thereof (9 F.R. 14008; 21 C.F.R. 1944 Supp. Sec. 36.6) rob these earlier proceedings of the legal significance petitioner attaches to them. At the 1944 hearing the issue squarely presented (and made the subject of important regulations) dealt directly and specifically with a formal proposal to establish a fill of container standard for canned oysters. Such a standard was duly

and lawfully established by the regulations promulgated as a result of this hearing, and it may be noted that a change in such a standard is also one of the basic issues before us on this review.[2] (See later references to the 1944 hearing.)

In reliance upon these so-called "antecedent proceedings" petitioner contends that in using a 5 ounce fill in the No. 1 EO can[3] oyster canners were "following" a so-called "advisory announcement" issued by the Bureau of Chemistry in the Department of Agriculture in February, 1914. This "announcement" recited that "pending further investigation" the weights agreed on by a meeting of canners held in Washington in 1912 would be regarded by the Board as satisfactorily fulfilling the requirements of Food Inspection Decision No. 144.[4]

It appears to be petitioner's position that these early pronouncements (applicable to departmental policy of the period when they were promulgated) in some manner conferred upon oyster canners a valuable and continuing "right" to use a 5 ounce fill in the No. 1 can, and that this right was destroyed by the order of 1948 here reviewed.

If this is petitioner's position we are unable to agree with it. To follow this reasoning would require us to ignore the compelling legal effect of the subsequent 1944 regulatory order, which we think was lawfully adopted. Whatever the force and effect of these former pronouncements of departmental policy it is certain that the field of regulation they purported to occupy was, under statutory authority, completely pre-empted and occupied by the above mentioned regulations adopted in the 1944 proceedings. The most that can be said of these older "announcements" is that they possess (so far as this hearing is concern-

---

[2] The 1944 regulation was silent regarding the character of labels to be placed on cans of oysters. The question of labels for cans, and requirements respecting them, was first dealt with in formal proceedings before the Administrator in 1947, resulting in the First Order of March 10, 1948, which is here challenged.

[3] This can measures 2-11/16 by 4 inches.

[4] At this time the Bureau of Chemistry had charge of the administration of the Food and Drugs Act of 1906, 34 Stat. 768. The Bureau had a Board of Food and Drug Inspection which, in 1912, had issued Decision No. 144. One provision of Decision 144 recited that "canned foods * * * will be deemed adulterated if they are found to contain water, brine, syrup, sauce, or similar substances in excess of the amount necessary for their proper preparation and sterilization." See references in footnote 1.

ed) only historical interest. Subsequent and sweeping statutory changes of vital and compelling significance, and later adoption of new administrative regulations under these statutory changes completely devitalized these old pronouncements of policy. We cannot view them as having an effect that even remotely touches the issues posed on this review.

The record shows that petitioner was not canning oysters in 1944 (for reasons later stated) as a consequence of which its business operations were not affected by the 1944 regulations which established a standard of fill. Due to this situation it contented itself with entering a formal appearance at the 1944 hearing apparently for the sole purpose of filing (as it did) a challenge to the sufficiency of the evidence there adduced.

The so-called "Southern (oyster canning) Industry" did not appear at the 1944 hearing, and petitioner represents to us that "Western packers could not challenge" the 1944 regulatory order (although they alone had protested) because they were not "adversely affected" within the jurisdictional requirements of 21 U.S.C.A. § 371(f) (1), Food, Drug and Cosmetic Act.

The 1944 order was published by the Administrator in the Federal Register, November 25, 1944, 9 F.R. 14008-9, the preamble of the order reciting that it was promulgated under his authority as head of the Food and Drug Administration of his Agency. The order further recites that the statutory authority of the Administrator to promulgate the said order derives from 21 U.S.C.A. §§ 341, 343(h) (2) and § 371, the Reorganization Act of 1939, 53 Stat. 561 f.f., 5 U.S.C.A. §§ 133–133v, and Reorganization Plans No. 1, 53 Stat. 1423, and No. 4, 54 Stat. 1234, 5 U.S.C.A. following section 133t.

There is no doubt in our minds that the 1944 proceeding before the Administrator lawfully established and promulgated regulations applicable to a standard of fill to be observed in the oyster canning industry. Concluding, as we do, that the 1944 regulations were valid, it follows that they continued to be effective and applicable to the business of oyster canning until modified or superseded by subsequent legisla-

tion and/or subsequent regulations adopted in compliance with duly ordained standards of administrative procedure.

With this view of the law as a basis we consider certain other facts and circumstances alluded to in petitioner's brief which it asserts also have a material bearing on the issue before us. These matters are also associated with aspects of the history of regulation of the oyster canning industry.

Before 1942 canners of oysters in all areas of the United States filled the No. 1 EO can (the one in principal use) to yield a "drained" or "cut-out" weight of 5 ounces of oysters. By December, 1942, war conditions were such that tin plate was in short supply. In that month a war agency, the War Production Board, issued a "conservation order" (Order M-81) which effectively denied tin plate to oyster canners *except* where the cans (No. 1 EO were filled to yield at least 7-½ ounces of oysters. The basis of the WPB conservation order was that the shortage of supply created a "wastage" of tin plate if the 5 ounce fill was continued. This order was a "war measure."

Western (Pacific Coast) oyster canners had been canning oysters since 1928 but upon issuance of the above noted "conservation order" elected to cease canning operations and hence they did not secure tin plate during the so-called "war years." They did not resume canning operations until April, 1946, at which time they again used (in the No. 1 can) the 5 ounce fill of the pre-war period.

At this time (April, 1946) Atlantic and Gulf oyster canners were marketing their oysters with a 7½ ounce fill in the No. 1 can. Petitioner refers in its brief to the testimony of a witness for the Food and Drug Administration (at the July 10, 1947 hearing, which resulted in the First Order) that because of this condition "violent complaints" were received by his department from "the Southern industry" then using the 7½ ounce fill.

The length of the 1944 order and its ready accessibility to interested persons makes unnecessary a recital of its terms. It is sufficient to point out that a department witness testified at the 1947 hearing

which resulted in the First Order (March 10, 1948) in the instant case, that the 1944 order of the Administrator established a "fill of container" for canned oysters of a certain (small) size and (it) *was inapplicable to large sized oysters,* that is to Pacific Coast oysters.[5] This witness stated that the evidence introduced in the 1944 hearing was *insufficient to establish what constituted a proper fill for canned Pacific oysters;* that since that time (1944) such evidence has become available. In his testimony appears reference to "investigations made as early as 1940" which did not result in action on such investigations. It was to reach both questions—"standards of identity" and a "standard of fill" of containers—that the 1947 hearing was held.

### The 1947 Hearing.

For the reasons stated above we are persuaded that when the Administrator decided to call the 1947 hearing, his authority to adopt new regulations was not circumscribed by the past events above noted, nor was his program of contemplated action complicated by the necessity of resolving doubts concerning the validity of *any* of these past departmental rulings, regulations or *any* of the past "advisory" opinions purporting to establish rules or regulations of general applicability in the oyster canning industry.[6] By reason of this fact the Administrator faced the 1947 proceedings possessed of full authority to make new regulations or modify existing ones, provided the evidence adduced at the hearing justified, and applicable law supported, the changes he elected to make in this particular field of Federal regulation.

Under date of February 3, 1947 the Administrator issued a formal "Notice to Packers of Canned Oysters," in which he set forth a "Statement of General Policy or Interpretation" in which he announced the intention of the Agency to call a hearing as soon as practicable on proposals to adopt "definitions and standards of identity *and* standards of fill of container for *all* canned oysters." (Emphasis supplied.) This notice was duly published in the Federal Register of February 7, 1947. It was issued pursuant to Section 3 of the Administrative Procedure Act, 5 U.S.C.A. § 1002.

Petitioner is aggrieved because the first advice it received of the above mentioned "Notice" was by its publication in the Federal Register. It criticizes the notice on the ground that its terms "would appear to indicate that petitioner * * * [was] in some manner violating the [Food and Drug] Act." This criticism is vague and on the face of the record is without merit. (See footnotes 5 and 6.) We find nothing in the record to indicate that petitioner was in any way prejudiced by the form and contents of the Notice, date of issuance and publication.

Following the issuance and publication of the February, 1947 notice, the Administrator took the next formal step in the execution of the program suggested in this notice. On June 6, 1947 he published a "Notice of Hearing" which was to commence July 10, 1947 at Washington, D. C. (The First Order resulted from this hearing.) This formal notice of hearing was published and appears in 12 F.R. 3726.

Petitioner criticizes this "Notice of Hearing" on the ground that it did not advise of any *precise proposal* to change the standard of fill, either by increasing or lowering the then existing standards, i.e., 5 ounces for large oysters and 7½ ounces for small oysters, but left that figure blank "to be fixed on the basis of evidence taken at the hearing." The reference here is to language which discusses proposals to change the terms of the previously (1944) adopted regulations 36.6.

---

[5] The 1944 order and the proceedings from which it resulted clearly indicate that Pacific type oysters were not brought within the scope of the order or the regulations it prescribed. These regulations (36.6) were limited in their application to oysters weighing less than ½ ounce. The 1948 order also clearly indicates that the 1944 order did not include a requirement of fill covering the drained weight of oysters of "large size," i.e., Pacific oysters.

[6] While the 1944 proceedings before the Administrator superseded all of these and spelled out a wholly new set of rules which were intended to and did completely occupy and dominate the entire field of regulation, the order did omit the establishment of "standards of identity."

■ Petitioner cites no authority nor do we find any which suggests the impropriety or invalidity of this sort of notice of hearing or the hearing held pursuant to it. The notice certainly indicated with blunt directness the intention of the Administrator to establish changes in the standard of fill, and in this important respect we find nothing in it which could have misled interested parties to their prejudice. It was phrased in such fashion that they could know exactly what issue they would confront at the hearing. An examination of the recitals in the first part of the notice reveals the purpose of the Administrator to take action on the standard of fill "upon application of a substantial portion of the industry," and "upon his own initiative," "and upon proposals of the Administrator," to fix, by regulations, a definition and standard of identity for canned oysters. That sort of definitive language made his purpose abundantly plain.

Being convinced that the procedural steps leading to the 1947 hearing conform in all respects to statutory requirements we proceed to a consideration of that proceeding. If petitioner's charge of invalidity leveled at the First and Second Orders is sound in law, their infirmities must be disclosed by what occurred at that hearing *and* in the subsequent, and additional hearing of 1948 held pursuant to our order of remand.

Preliminary to the inquiry into the 1947 proceedings we think that certain calculations will be helpful in viewing the effect of the regulations assailed in this proceeding. Pertinent references appear in the orders and regulations of 1944 and 1948 concerning the "water capacity" of containers (cans) used by oyster canners. The commonly used can, (the No. 1) has a water capacity of approximately 11 ounces. The relationship of can capacity to the "fill" of oysters is established by the requirements set forth in the noted regulations.

The terms "cut-out weight" and "drained weight" mean the net weight of oyster meat in the can when it reaches the ulti-

mate consumer—in other words, the "fill" of the container.

Assuming for approximate purposes the use of the standard 11 ounce can, the relationship of fill of oysters to can capacity would be as follows: a "drained weight" of 5 ounces of oyster meat would occupy 46% of the water capacity; 6½ ounces of oyster meat would occupy 59%; 7 ounces of oyster meat would occupy 64%, and 7½ ounces of oyster meat would occupy 68%.[7]

The record of administrative proceedings in this case is long and involved. Even a brief summary of its nearly 1200 pages of testimony and the provisions of numerous exhibits (many of involved statistical character) would expand this opinion beyond reasonable limits. However, in meeting the issues posed by a record of this character we have approached the problem with awareness of the duty imposed upon reviewing courts by the Congress. See 5 U.S.C.A. § 1009(e). This section of the applicable Administrative Procedure Act of 1946 (referred to herein as the Act) requires us to "review the whole record or such portions thereof as may be cited by any party" and to set aside agency findings and conclusions "unsupported by substantial evidence." See also 21 U.S.C.A. § 371(e).

■ We do not view this particular directive, § 1009(e), as one requiring us to go beyond the limits now generally recognized under the so-called "substantial evidence" rule, or to weigh evidence and substitute our own judgment for that of the administrative agency. We think that we conform to it when we consider the evidence on both sides in order to determine whether it appears that the evidence in support of the administrative conclusion can fairly be said to be substantial in the face of opposing evidence. We do not indulge the assumption that § 1009(e), 5 U.S.C.A., invites judges to give a brevet to their fancies, thereby approving adoption of purely subjective judgments in passing upon the validity of administrative

7 The application of this formula is seen in regulatory practice. Consult the provisions of the cited orders of 1944 and 1948, and regulation 36.6 therein. This regulation (of 1944) was replaced by one of the same number by the 1948 order.

regulations, and the orders establishing them.

The rational conclusion respecting the foregoing matter is that judges are not free to evaluate the legal status of challenged regulations on the basis of their individual notions and purely personal views as to the "fairness," sound sense, good business judgment and/or propriety of such regulations when measuring them off against all of the facts and circumstances of administrative proceedings under review. Validation of such a theory would translate review proceedings into a game of chance in which the objecting parties, however untenable their arguments, would have far more than a second bite at the cherry on every conceivable sort of legal and factual issue in the case, and administrative boards would be mere deposition takers for courts of review.

■ When it enacted the Administrative Procedure Act in 1946, with its review proceedings, 5 U.S.C.A. § 1009, Congress did not see fit to amend the provisions of the Food and Drugs Act, 21 U.S.C.A. § 371, relating to the scope of review proceedings under the latter Act, and for this reason Circuit courts face the task of harmonizing the review provisions of both pieces of legislation. The review provisions of both Acts are in pari materia; both relate to the same matter or subject, and it is our view that they dovetail and should be considered together and given effect since it cannot be said that they are so inconsistent that to apply them to the record before us would create confusion. We think that this danger does not exist. See comments pp. 94, 95, Attorney General's Manual on Administrative Procedure Act.

Section 371, supra, specifically provides that "the *findings* of the Administrator *as to the facts,* if supported by substantial evidence, *shall be conclusive.*" (Emphasis supplied.) See subdiv. (f) (3).

Related directly to the foregoing provision of Section 371 is the introductory "excepting" clause with which Section 10 of the Act opens, 5 U.S.C.A. § 1009, which clause provides that judicial review is available under the Act to any person adversely af-

fected, etc., "*except so far as* (1) statutes *preclude* judicial review or (2) agency action is by law committed to agency discretion." (Emphasis supplied.) See also 21 U.S.C.A. § 371(f) (6), holding that the remedies provided for in this subsection shall be in addition to and not in substitution for any other remedies provided by law.

■ From the foregoing, it would seem clear that "findings of fact" made by the Administrator, if supported by substantial evidence, are conclusive on this review. Cf. United States ex rel. Trinler v. Carusi, 3 Cir., 166 F.2d 457, 460, 461.

It is also desirable to make brief reference to the many other applicable provisions of the Act. Particular attention is directed to those provisions defining the meaning of the terms "Rule," "Rule-making," "Order," "Adjudication," "Agency proceeding" and "Agency action." These statutory definitions are applicable in the inquiry at bar.

■ The Act makes clear that in the proceedings before the Administrator, the proponent of a rule or order must carry the burden of proof. The Act also authorizes the agency to receive *any evidence,* although as a matter of policy it should exclude irrelevant, immaterial or unduly repetitious matter. However, the presence of such matter in the record does not call for reversal of agency action where on the whole record the rule or order issued is supported by reliable, probative and substantial evidence.

The comments of the House member who submitted the Report of its Judiciary Committee on the bill, dealt directly with the interpretation and intent of the bill which became the Act. In appraising the terms of the bill (which passed unanimously) he stated to the House that the terms "Order" and "Adjudication" used therein cover the *judicial functions* of agencies, and embrace all of the decisions that agencies make *other than* "Rule-making," that is to say, the doing of things which courts otherwise do. The definitions of "Rule" and "Rule-making" apply whenever agencies *are exercising legislative functions and powers,* i. e., when issuing general or par-

ticular *regulations* which in form or effect are like the statutes of Congress.

In the noted (and paraphrased) statement of the House member in charge of the bill, he appeared to be adopting accepted analytical terminology.

The above referred to Congressional comment on procedural requirements under the Act serves to illustrate and emphasize important aspects of this legislation.

Under authority conferred by the Act we now dispose of the challenge to the validity of the First and Second Orders. As indicated above, petitioner's brief presents five basic contentions. In these it asserts that the First and Second Orders are unlawful because they were (a) made without observing procedural requirements; (b) unsupported by substantial evidence; (c) in excess of statutory jurisdiction; (d) arbitrary, capricious, and an abuse of discretion; and, (e) contrary to constitutional rights. Other formal contentions are argumentatively presented in a manner which lays heavy emphasis on six points mentioned below. Of these, three main points are (1) that neither respondent "conscientiously read or considered all of the evidence"; (2) that a witness for the Food and Drug Administration and its counsel either wrote or had a hand in preparing the First Order; and (3) that erroneous rulings upon evidence were made by the hearing examiner.

Subsidiary contentions are that (1) the notice of hearing (of July, 1947) was inadequate; (2) that the conduct of the proceedings was not fair; (3) that the hearing examiner put an unlawful burden of proof upon petitioner at the hearing held after remand by this court.

Fundamentally, these contentions carry us back to two basic questions. First, does the Administrator possess lawful authority to make and promulgate orders containing regulations of the legal character of those under review? Second, if the first question calls for an affirmative answer (and we think it does) were the proceedings at the hearings which resulted in the promulgation of the First and Second Orders tainted with the infirmities charged by petitioner?

The vigorous and multi-pronged attack on the validity of the procedural steps leading to the promulgation of the First and Second Orders suggests a brief reference to the statutory authority of the Administrator to make the criticised orders, and second, a reference to the authority of this court to set aside either or both of them as "not in accordance with law." As to the first, the pertinent language in 21 U.S.C.A. § 341, Food and Drugs Act, is a "directive" which sets forth that the Administrator "shall promulgate regulations fixing and establishing *for any food, under its common or usual name so far as practicable,* a *reasonable* definition and standard of indentity, * * * and/or *reasonable* standards of fill of container." (Emphasis supplied.)

As to the second matter, the authority to set aside an order on judicial review is found in 21 U.S.C.A. § 371(f) (3) (6) Food and Drugs Act, and the scope and legal tests of judicial review are also set forth in the Act, 5 U.S.C.A. § 1009(e). The last cited statute empowers a reviewing court to "hold unlawful and set aside *agency action*" i. e. "order"—5 U.S.C.A. § 1001(g), which it may find to be "arbitrary, capricious, and abuse of discretion," or as violative of some other provision of said subsection (e).

### The Fixing of Standards

As indicated above, we do not doubt that the Administrator possesses ample statutory authority to adopt Orders, and Regulations of the character of those (36.5 and 36.6) here involved, and we do not understand petitioner to be denying such basic statutory authority. Its petition for review challenges the validity of the *procedural steps* employed by the Administrator which eventuated in the adoption of the regulations embodying the "requirements" it objects to—it does not object to the exercise of the basic statutory authority underlying *valid* official pronouncements of their character.

At the outset of this opinion we pointed out that petitioner's challenge was directed against the "requirements" for a 59% "fill" of oysters, *and* the type of identifying label to be used on its canned product, that is,

"Pacific Oysters." If these "requirements" in the regulations are "reasonable" under 21 U.S.C.A. § 341, it is beyond the power of this court to set them aside unless it can be said upon the entire record, that the agency proceedings underlying and establishing the orders (agency action) promulgating the challenged regulations were so irregular and conducted with such indifference to, or in such defiance of, statutory procedural requirements, as to rob them of any lawful basis or authority for their existence. If the record shows such to be the case (as petitioner charges) then the orders are invalid. See 5 U.S.C.A. § 1009(e).

### Standard of Fill

The justification for the Administrator's order is his belief that any oyster canning method which ultimately results in a container but one-half full of oysters is unfair to the consumer, and that a mere statement on the label of the ounce content of drained oysters[8] is not sufficiently curative. In short he feels that the consumer is entitled to receive more oyster meat and less liquid.

Petitioner answers that by its method, "blanching," (described below),[9] the highly nutritious liquid content of the oyster is saved and the oyster is thus suspended in a perfect packing medium, all of which results in a much higher quality product. Further, because of the shrinkage of the oyster after the can is sealed, it is impossible to utilize the blanching method and retain a finished product containing more than five ounces of oyster meat unless in the canning process the oysters are "crammed" into the can resulting in a much higher incidence of "twisting, tearing, breaking, and browning." Petitioner further complains that this will result in an excessive waste of oysters in the sealing process[10] by "clipping" of the top oysters which then protrude from the top of the can.[11] This will result in a higher number of imperfect oysters. The total result, petitioner asserts, can only be the destruction of the high good will and consumer acceptance it has built up over a period of years.[12] It claims that it now enjoys 60% of the market for Western oysters.

The Administrator found, and there was evidence tending to show, that the eleven ounce can could be filled to yield 6½

---

[8] Suggested by the court on oral argument as a possible alternative. Petitioner thereafter did so label his product.

[9] The raw oysters are taken from the shell and dipped in a hot brine solution for a period of 30 to 60 seconds. They are then washed in fresh water, cooled, and held in warm water until ready to be canned. In order to obtain a net drained weight of 5 ounces of oyster meat, each 11 ounce can is then filled to 7½ ounces of oysters and the balance is filled with water to which a salt tablet is added. The conveyor carries the can to the sealing machine where a "topper plunger" pushes the oysters down into the can and the sealing machine then seals it. The can is then subjected to heat for sterilization and preservative purposes for 30 minutes which causes the oyster to lose liquid content into the packing medium. This loss is approximately 2½ ounces per can—the oysters have already lost approximately 16% of their weight in the blanching process. The packing medium is then enriched by this "nectar" and soluble solids. Tests made for petitioner by independent laboratories tend to show that this nectar contains nutritional value and is of some

use as a separate drink or as a flavoring for oyster stews.

Large oysters of any species, because of their size, are better able to retain this "nectar" (roughly corresponding to the lymph, blood, and liquid content of the tissues of mammals) in the initial application of heat when the smaller oyster loses it. Thus the latter has little or none of this liquid to exude into the packing medium during the sterilization process in the can and shrinks very little if any.

[10] See footnote 9.

[11] There is a certain amount of "clipping" when the can is filled to equal the 5 ounce result thus petitioner contends that logically there must be a higher percentage of clipping when more oysters are placed in the can. There is also some evidence that the oysters tend to rise somewhat in the warm water packing medium.

[12] Petitioner first inaugurated its blanching method subsequent to the taking of evidence preceding the first final order of March 10, 1948. See opinion, p. 174 F.2d 681 supra. Prior to that time it had used a pre-steaming method.

ounces net drained weight[13] by the use of the blanching method without a substantial increase in the incidence of the above mentioned detractive features. Both the Government and petitioner conducted various tests of oysters packed to conform to the 6½ ounce drained weight standard, with a variance in results not uncommon in tests of such a character. Petitioner's scientists arbitrarily assigned a certain number of demerits to the above-mentioned factors of twisting, browning, etc., in accordance with the believed consequentive effect of each upon consumer acceptance. This method is not to be denounced, indeed, it was probably the only computative method possible, excluding an actual consumer reaction test, but the weight apportioned to each factor and the alleged results of the tests were all questions of fact which the Administrator had to resolve. The organoleptic examinations of the Government, on the other hand, were probably less efficiently conducted and with less scrupulous regard to strict scientific media,[14] but we do not find they contain the infirmities so vigorously asserted by petitioner. Moreover the conclusions drawn therefrom are strongly supported by the results of a commercial buyer's preference examination by the Government covering seven Seattle wholesale buyers who had extensive experience in buying and selling canned oysters,[15] in that the buyers reached substantially the same conclusions as the Government chemists who conducted the organoleptic examinations. Moreover highly qualified and experienced agency personnel witnessed the actual canning of various of the test packs canned to equal the new higher drained weight standard. On the basis of their own observations they testified that little trouble was encountered and that the new standard could be met even without alteration of machinery or method.

Merely because the findings were in accord with the contentions and evidence of the Government does not demonstrate to us that the Administrator considered only Government evidence and disregarded that of the petitioner. Even though *we* might feel that petitioner's evidence was the more convincing, and *we* might have concluded differently, the evidence considered in its entirety, is clearly sufficient to support the findings made. At the risk of tautology, it might not be amiss to reemphasize that this court does not try facts[16] where factual conclusions are drawn from substantial evidence supporting opposed contentions. We will only delve sufficiently deep to ascertain whether the evidence adduced will logically and rationally permit the findings made. Section 10(e) of the Administrative Procedure Act provides that "In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error." This was not intended to require reviewing courts to weigh the evidence and make independent findings of fact; rather, it means that in determining whether agency action is supported by substantial evidence, the reviewing court should consider all the evidence in its measure as an integrated whole and not just the evidence favoring only one side.[17] We hold the findings to be sufficiently supported.

---

[13] By filling the can to approximately 9 ounces.

[14] See Crocker, McGraw-Hill Series in Food Technology, Flavor, 1945.

[15] The Administrator could certainly believe it significant that petitioner never attempted to impeach the alleged results of this test by cross-examination.

[16] See Grace Bros. v. Commissioner, 9 Cir., 1949, 173 F.2d 170, and authorities cited therein.

[17] Senate Hearings, p. 1359 (1941); Attorney General's Manual, supra, p. 110. Administrative Procedure Act—Legislative History, 79th Cong., 2nd Session, 1944-46, Sen.Doc. No. 248, p. 279: " 'Substantial evidence' means evidence which on the whole record is clearly substantial, plainly sufficient to support a finding or conclusion under the requirements of section 7(c), and material to the issues. It is exceedingly important. **Difficulty has come about by the practice of agencies and courts to rely upon something less—suspicion, surmise, implications, or plainly incredible evidence.** Although the agency must do so in the first instance, under this bill it will be the duty of the courts to determine in the final analysis and in the exercise of their independent judgment whether on the whole of the proofs

It now remains for us to examine the proceedings in the light of their alleged statutory and constitutional defects.

## Admissibility of Hearsay

Petitioner vigorously complains of the admission of certain hearsay evidence primarily consisting of documentary reports of certain inspectors of the Food and Drug Administration not present for cross examination.

 The common law exclusionary rules of evidence are not based in Constitutional interdictions and are not applicable to administrative proceedings, even of judicial character, in the absence of statutory requirement.[18] Neither § 701(f) (3) of the Food, Drug and Cosmetic Act, supra, nor § 7(c) of the Administrative Procedure Act, supra, so require, either expressly or by implication from the language used. To the contrary, the latter Act enjoins that:

" * * * *Any* oral or documentary evidence may be received,. but every agency shall as a matter of policy provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except upon consideration of the whole rec-ord or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence." (Emphasis supplied.)[19]

 Thus the *receipt* of such evidence, over objection, and even if "immaterial, irrelevant," etc., is not such a grievous error as to require reversal.[20] The receipt of irrelevant, immaterial and hearsay evidence is no cause for reversal of an administrative order though the validity of the order can never rest upon conjecture, guess or chance.

 However, both the Food and Drug Act and the Administrative Procedure Act enjoin in effect that the findings are to be in accord with the substantial evidence and in that posture are conclusive upon the reviewing tribunal.[21] This is but a restatement of the general rule of judicial review applied by appellate tribunals to the findings of fact of lower courts.[22] The requirement that the administrative findings accord with the substantial evidence does not forbid administrative utilization of probative hearsay in making such findings. Such construction would nullify the first portion of section 7(c), Adminis-

brought to their attention the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action or inaction. In reviewing a case under this fifth category the court must base its judgment upon its own review of the entire record or so much thereof as may be cited by any party." (Emphasis supplied.)

[18] Opp Cotton Mills v. Administrator of Wage and Hour Division of Department of Labor, 1940, 312 U.S. 126, 155, 61 S. Ct. 524, 85 L.Ed. 624.

[19] "Such evidence [irrelevant, immaterial, etc.,] is useless and to be excluded as a matter of efficiency and good practice." Sen. Doc. 248 supra, pp. 364–365. Note that there is no lay jury to be protected from improper influence.

[20] See Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 229–230, 59 S.Ct. 206, 83 L. Ed. 126; Tagg Bros. & Moorhead v. United States, 1930, 280 U.S. 420, 442, 50 S.Ct. 220, 74 L.Ed. 524; United States v. Abilene & S. R. Co., 1924, 265 U.S. 274, 288, 44 S.Ct. 565, 68 L.Ed. 1016; but cf. Interstate Commerce Commission v. Louisville & Nashville R. Co.,

1913, 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431; Powhatan Mining Co. v. Ickes, 6 Cir., 1941, 118 F.2d 105. See also Attorney General's Manual, supra, pp. 77-78; Stephan, Fact-Finding Boards and Rules of Evidence, 24 A.B.A.J. 630, 636(1938).

[21] 21 U.S.C.A. 371(f) (3), Food and Drug Act, provides: " * * * The findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive." The same result is reached by the Administrative Procedure Act, 5 U.S.C.A. § 1009, where the reviewing court is directed to "set aside agency action, findings, and conclusions found to be * * * (5) unsupported by substantial evidence * * * subject to the requirements of sections 1006 and 1007 * * *." Sections 1006 and 1007 involve hearings and procedure in cases of rule making, § 1003, and adjudication, § 1004.

[22] That this is the purpose of the Administrative Procedure Act see Attorney General's Manual, supra, p. 93 and reference to section 10(e), p. 230 Senate Doc. 248, supra.

trative Procedure Act, providing for the receipt of such evidence.

The degrees of probative force and reliability of hearsay evidence are infinite in variation, and its use by administrative bodies, ex necessitate, must in part be governed by the relative unavailability of other and better evidence. However, since "substantial evidence" includes more than "uncorroborated hearsay" and "more than a mere scintilla," [23] the findings, to be valid, cannot be based upon hearsay alone, nor upon hearsay corroborated by a mere scintilla. Founded upon these requirements, the test whether evidence is "substantial," is whether, in the individual case before the court, there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [24]

An exhaustive search of the entire record convinces us that the portion of the order relating to fill satisfies this test and there was no abusive and thus reversible use of hearsay.[25]

Further, even though some of the findings *may* be questionable, such findings merely lose their conclusive character, i. e., lose any persuasiveness they may have had upon the reviewing court.[26] But when, as here, there are sufficient validly supported findings to uphold an administrative order, the court may not upset it.

### Exclusion of Bases of Tabulation

Petitioner also complains that although Government Exhibit 33, a tabulation in summary of the findings and results of certain Government tests, was admitted into evidence, the worksheets upon which it was based were excluded; further, that comparison discloses that the tabulation is not a true representation of such worksheets, and thus not of the true results of the tests.

As we held in Augustine v. Bowles,[27] the rule is that "Where voluminous documents are a necessary part of the evidence in a cause, it is well settled that tabulations of these documents in the forms of charts and schedules may be introduced for the aid of the trier of fact. 4 Wigmore, 3d Ed., § 1230. Most courts require that the mass thus summarily testified to, if the occasion seems to require it, be placed on hand in court so that the opposing party may inspect it and use the material for cross-examination." To this rule we adhere. Petitioner had adequate access to these worksheets and utilized the information gained therefrom for its cross-examination. Thus, to this point, there is no error.

The trial examiner refused to permit the worksheets to become part of the record by virtue of petitioner's offer of proof so that the validity of the contention that Exhibit 33 did not truly memorialize the worksheets could be examined on review. The reason assigned for the denial was that since the worksheets would become part of the official records, the Administrator would have adequate access to them. However,

[23] Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 229–230, 59 S.Ct. 206, 217, 83 L.Ed. 126.

[24] Ibid. 305 U.S. at page 229, 59 S.Ct. at page 217, 83 L.Ed. 126. See discussions in Pennsylvania R. Co. v. Chamberlain, 1932, 288 U.S. 333, 339–343, 53 S.Ct. 391, 77 L.Ed. 819; Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 2 Cir., 1938, 98 F.2d 758, 760; N. L. R. B. v. Thompson Products, 6 Cir., 1938, 97 F.2d 13, 15; Appalachian Electric Power Co. v. N. L. R. B., 4 Cir., 1938, 93 F.2d 985, 989; see also Daniels, Jud. Review of Fact Findings of the Federal Trade Commission, 14 Wash.L.Rev. 37 (1939).

[25] Washington, Virginia & Maryland Coach Co. v. N. L. R. B., 1937, 301 U.S. 142, 147, 57 S.Ct. 648, 81 L.Ed. 965;

Del Vecchio v. Bowers, 1935, 296 U.S. 280, 287, 56 S.Ct. 190, 80 L.Ed. 229; State of Florida v. United States, 1934, 292 U.S. 1, 12, 54 S.Ct. 603, 78 L.Ed. 1077; Federal Trade Commission v. Algoma Lumber Co., 1934, 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655.

[26] Cf. N. L. R. B. v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 1940, 109 F.2d 128, 130; N. L. R. B. v. Empire Furniture Corp., 6 Cir., 1939, 107 F.2d 92, 94; Appalachian Electric Power Co. v. N. L. R. B., supra, footnote 24.

[27] 9 Cir., 1945, 149 F.2d 93, 96 and authorities cited. See also Harper v. United States, 8 Cir., 1944, 143 F.2d 795, 804–806; and, 4 Wigmore § 1231, 3d Ed. Cf., Wilkes v. United States, 9 Cir., 1937, 80 F.2d 285, 291; Shreve v. United States, 9 Cir., 1939, 103 F.2d 796.

the worksheets as such, not being in the record, are not before us.[28]

Petitioner's use of the excluded worksheets in its cross-examination served, in effect, as its offer of proof. It "extracted" those items which it (both here and below) alleges as discrepancies. Thus we may examine in the record, the matter so extracted.[29] If all of the worksheets were in the record we would not feel constrained to examine other than the portions thereof to which our attention was directed. Such is the normal rule and is embodied in section 10(e) of the Administrative Procedure Act, supra, which provides in part:

" * * * the court shall review the whole record or such portions thereof as may be cited by any party, * * *";

█ Further, petitioner may not urge here alleged errors and discrepancies between the worksheets and Exhibit 33 which it did not bring to the attention of the trial examiner and may not allege here for the first time that it had an inadequate opportunity for a sufficient comparison.

█ To exclude an offer of proof is a dangerous and imperfect practice.[30] Administrative tribunals should be hesitant and reluctant to indulge such practices. However, each case must be determined on its individual facts and we find no prejudice here. We have examined the alleged discrepancies and errors both in the record and as stated by petitioner's brief and find them to be minor and unsubstantial. They clearly do not show, as petitioner contends,

that Exhibit 33 is "honeycombed with error."

### Rule-Making or Adjudication

Petitioner attempted to show at the second hearing, and here alleges, that the chief Government witness Callaway and Government counsel aided and prepared portions of the findings and conclusions, contrary to section 5(c) of the Administrative Procedure Act, supra, which in part provides:

"No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review * * *."

The proof was denied on the ground that this proceeding fell into the category of "rule-making" and the prohibitory section above, applied only to "adjudication" and was thus not involved.

█ The Administrative Procedure Act is based upon a broad and logical dichotomy between "rule-making" and "adjudication," i. e., legislative and judicial functions. In the framework of the Act, separate sections deal with *rule-making* and *adjudication;* section 4 is concerned with the former, section 5, the latter. Sections 7 and 8 fix rules governing hearings and decisions applicable to both classes of proceedings. Section 5(c) does not and was not intended to apply to instances of rule-making.[31] Pe-

---

[28] We would have the worksheets certified up to us if we believed it were necessary to a proper disposal of this case.

[29] Petitioner nowhere contends that his opportunity to examine and compare the worksheets was inadequate and he did not request additional time for this purpose of the trial examiner.

[30] Another questionable practice is that of hearing officers who hold much of the discussion and argument concerning the relevancy of evidence, etc., "off the record."

[31] In rule-making, " * * * the parties will be better served if the proposed decision—later required by section 8—reflects the views of the responsible officers in the agencies whether or not they have actually taken the evidence." Sen.Doc. 248, supra, p. 361; Attorney

General's Manual, supra, pp. 50-58, 128.

The second and third sentences of section 5(c) provide for the separation of functions of hearing and decision from functions of investigation and prosecution. The second sentence provides:

"Save to the extent required for the disposition of ex parte matters as authorized by law, no such officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate; nor shall such officer be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency."

It applies generally to the hearing process or the making of the record. Its broad purpose is to assure that hear-

titioner however, contends that even in cases of rule-making, when sharply contested issues of fact are involved, adjudication procedures should be followed. Cited in support thereof are excerpts from Congressional reports [32] to the effect that in such a situation, "good practice" would be for the agencies to follow the rules laid down for adjudications. As a matter of policy, such may be true, but the Act as finally enacted did not so provide and we cannot believe that the omission was the result of oversight.

We turn now to whether the proceeding here involved was *rule-making* or *adjudication*. If adjudication, then the action of the trial examiner in denying proof of participation by prosecuting officials in the findings, etc., was error and the case must be remanded.

Rule-making is legislation on the administrative level, i. e., legislation within the confines (standard) of the granting statute as required by the Constitution and its doctrines of non-delegability and separability of powers.[33] Section 2(c) of the Administrative Procedure Act, supra, defines rule-making as the "agency process for the formulation, amendment, or repeal" of agency statements of:

"general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy * * *."

This is not novel reasoning but an explanation of existing concept and must be so construed. The legislative process i. e., rule-making, is normally directed primarily at "situations," rather than particular persons.[34] Individual protestations of injury are normally and necessarily lost in the quantum of the greater good.

Adjudication, defined by section 2(d) of the Administrative Procedure Act as any action other than rule-making but including licensing, comports with the judicial function. Its primary concern is with individual rights, liabilities for past conduct, or present status under existing law,[35] and tends to be accusative and disciplinary in nature.

Each definition necessarily is couched in terms of "tendency," its object, the so-called "clear case." The concepts are not wholly mutually exclusive but each

ings be conducted by hearing officers who have not received or obtained factual information outside the record and who are neither supervised nor directed in their conduct by investigative or prosecuting officials of the agency. In substance, no evidentiary or factual information may be received until, after notice, all parties are permitted to participate.

The third sentence, part of which is quoted in the body of this opinion, applies generally to the decisional process or the making of the recommended or initial decision. Its purpose is to insure decisions free from the participation or advice of officials engaged in investigative or prosecuting functions. This we conceive, would include aid, advice, or actual preparation of portions of the findings and conclusions.

[32] Sen.Doc. 248, supra, pp. 185, 203–4, 216.

[33] See Panama Refining Co. v. Ryan, 1935, 293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446.

[34] Yet note the cases on legislative divorces, etc. Sparhawk v. Sparhawk, 1874, 116 Mass. 315; Bingham v. Miller, 1848, 17 Ohio 445, 49 Am.Dec. 471; Wilkinson v. Leland, 1829, 2 Pet. 627, 27 U.S. 627, 7 L.Ed. 542; Maynard v. Hill,

1888, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654; see also Benton, The Distinction Between Legislative and Judicial Functions, 8 A.B.A.Rep. 261, 264–265 (1885); Pound, Justice According to Law, 14 Col. L.Rev. 1, 11–12 (1914); Sharp, The Classical American Doctrine of "The Separation of Powers," 2 U. of Chi.L. Rev. 385 (1935).

[35] Probably the best definition discovered by the writer is: "Legislation is the creation by the state of a right (including an authority, a privilege or an immunity), duty or status not dependent on the existence of a previous right, duty or status.

"Adjudication is the imposition of a specific duty in personam, or of a liability, or the granting of a right or status which is dependent on a previous right or duty, in that it is imposed by way of giving effect to a right or duty determined to exist or have existed, or by way of redress or punishment for its violation." Green, 29 Yale L.Rev. 369, 372-373 (1920); See also, Fuchs, Procedure in Administrative Rule-Making, 52 Harv.L. Rev. 259, 263 (1938); Hyneman, Administrative Adjudication: An Analysis, 51 Pol.Sci.Q. 383, 516 (1936).

to a degree contains elements of the other. In explication, it is an essence of legislation, functionally speaking, that in its immediate effect, it hurts some and benefits other members of society.[36] In the twi-light region, (often termed "quasi"), intermediating the poles of clarity, the doctrine of primary purpose controls.[37] So tested, we are without serious doubt that this was a rule-making proceeding. This is true even though the result of the order is of immediate and grave economic import to petitioner.

 Petitioner also complains that permitting the prosecutor to prepare portions of the findings and conclusions violates its constitutional right to a fair hearing. However in legislation, or rule-making, there is no constitutional right to any hearing whatsoever.[38] Thus the requirements of any hearing are to be tested solely by the statute so providing, which may or may not import constitutional concepts. As shown supra, this was not done by the pertinent sections of the Administrative Procedure Act so far as concerns separation of functions in rule-making proceedings. Thus petitioner's rights, neither statutory nor constitutional, have been violated.

 It must be noted that even in adjudications, there is no constitutional prohibition against the findings and conclusions being drawn by the successful party at the direction or with the permission of either a trial judge or administrative hearing officer. To so declare would cast unjustifiable opprobrium upon the trial bench of both the Federal and State judiciary. In judicial proceedings, the separation of judge and litigant necessary for a minimum of fairness is in that portion of the decisional process involved *in actually making the decision*.[39] It cannot be contended that mere drawing of the findings is participation in the actual decision. The requirement of section 5(c) of separation of functions in adjudications arose as the result of extensive public criticism of the fairness of hearings in which the trier of fact and the investigative and prosecuting officials were members of the same agency and often exchanged duties.[40]

---

36 Compare the language of Mr. Justice Stone in Miller v. Schoene, 1928, 276 U.S. 272, 279, 48 S.Ct. 246, 72 L.Ed. 568; and Luce, Legislative Problems (1935) p. 60: "In the last analysis nearly every law transfers something from A to B. It matters not whether this advantage be tangible or fancied, large or small. Somebody gains, somebody loses, for you cannot create an advantage out of a vacuum. This makes the whole question one of degree and there is no principle, no fundamental right, in a matter of degree."

37 See Morgan v. United States, 1936, 298 U.S. 468, 479, 56 S.Ct. 906, 80 L.Ed. 1288; Louisville & Nashville R. Co. v. Garrett, 1913, 231 U.S. 298, 307, 34 S.Ct. 48, 58 L.Ed. 229; Prentis v. Atlantic Coast Line Co., 1908, 211 U.S. 210, 226–227, 29 S.Ct. 67, 53 L.Ed. 150.

38 Bowles etc. v. Willingham et al., 1944, 321 U.S. 503, 519, 64 S.Ct. 641, 88 L.Ed. 892; In Bi-Metallic Investment Co. v. State Board of Equalization, 1915, 239 U.S. 441, at page 445, 36 S.Ct. 141, at page 142, 60 L.Ed. 372; Holmes, speaking for the court said: "Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town

meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."

39 Lee v. Fleming, Em.App.1946, 158 F. 2d 984, 987; N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F. 2d 39 and authorities cited page 52 et. seq.; Berkshire Employees Ass'n v. N. L. R. B., 3 Cir., 1941, 121 F.2d 235, 238–239; Maitland v. Zanga, 1896, 14 Wash. 92, 44 P. 117; Jones on Evidence, § 764, 2d Ed. 1908.

40 Inland Steel Co. v. N. L. R. B., 7 Cir., 1940, 109 F.2d 9; Montgomery Ward & Co. v. N. L. R. B., 8 Cir., 1939, 103 F.2d 147; Brinkley v. Hassig, 10 Cir., 1936, 83 F.2d 351; Palmer v. Ultimo, 7 Cir., 1934, 69 F.2d 1, certiorari denied, Ultimo v. Palmer, 1934, 293 U.S. 570, 55 S.Ct. 81, 79 L.Ed. 669. But see Jaffe, Invective and Investigation in Administrative Law, 52 Harv.L.Rev. 1201, 1218–1219 (1939): "It may well be that a sincere conviction as to public policy predisposes the mind where it might otherwise be in a position of doubt or

## Reasonableness: Limits of the Granting Statute

Petitioner also contends that under the particular facts of this case the standard of "reasonableness" by which the delegation of legislative authority to the Administrator is limited, has been exceeded.[41] In other words, it is argued that it is unreasonable that a new method of canning oysters which results in a much higher quality product as shown by established and increasing consumer acceptance should be destroyed, purportedly to protect that very consumer. Therein lies much superficial persuasiveness. A short and sufficient answer is that the findings supported by substantial evidence are, in substance, that the higher requirement of fill will not result in impairment of quality when using petitioner's method of canning blanched oysters.

The problem facing the Administrator is the wisdom and expediency of a policy determination within the limits of his jurisdiction. As to these matters a court on review may not substitute its judgment.[42] Within the Administrative Procedure Act, administrative discretion encompasses any of the number of policy decisions which can be supported by a given set of "substantial" factual data. Within that range his conclusions may not be judicially tampered with, excepting of course for procedural violations. The question of "reasonableness" reduces itself to whether the order is a rational conclusion and not so "unreasonable" as to be capricious, arbitrary or an abuse of discretion.

In this light too, we hold the portion of the order relating to standard of fill to be valid.

## Allegation That Administrator Did Not Consider the Evidence

The First Order was signed by respondent, Ewing, Federal Security Administrator. It recited that it was made "on the basis of the evidence received at the above entitled hearing duly held pursuant to notice." The Second Order, signed by respondent Kingsley, then Acting Administrator, recited that the supplemental findings and conclusions were made "on the basis of evidence" received at the second hearing. This recitation in and of itself does not state that respondent Kingsley included in his consideration the evidence taken at the first hearing but various of the supplemental findings refer to the transcript of the evidence and exhibits of the first hearing. From this, petitioner is impelled to accuse both officials of not conscientiously reading and considering all of the evidence. This despite letters from respondent Ewing to petitioner's attorneys that he "personally" and "thoroughly" considered evidence (necessarily of the first hearing) and found it to be substantially in support of the order.

Section 341 of Title 21, Food and Drug Act, supra, provides:

"Whenever in the judgment of the *Administrator* such action will promote honesty and fair dealing in the interest of consumers, *he* shall promulgate regulations fixing and establishing for any food, * * *." (Emphasis supplied.)

---

balance on a conflict of fact or a choice of applicable principle. But to announce out of hand that such a state of mind constitutes a 'disqualification' is in part quixotic and in part non-sequitur. A strong and sincere conviction as to certain laws may exist and does often exist in judges."

[41] 21 U.S.C.A. § 341, Food and Drug Act. Exceeding this limit is specifically made cause for reversal by section 10(e) (B) (3) of the Administrative Procedure Act.

[42] Federal Security Adm'r v. Quaker Oats Co., 1943, 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724, 158 A.L.R. 832; Federal Power Commission v. Natural Gas

Pipeline Co., 1942, 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037; Gray v. Powell, 1941, 314 U.S. 402, 412, 62 S.Ct. 326, 86 L.Ed. 301; N. L. R. B. v. Link Belt Co., 1941, 311 U.S. 584, 596–597, 61 S.Ct. 358, 85 L.Ed. 368; Rochester Tel. Corp. v. United States, 1939, 307 U.S. 125, 145–146, 59 S.Ct. 754, 83 L.Ed. 1147; Shields v. Utah Idaho Cent. R. Co., 1938, 305 U.S. 177, 185, 59 S.Ct. 160, 83 L.Ed. 111; United States v. Carolene Products Co., 1938, 304 U.S. 144, 151, 58 S.Ct. 778, 82 L.Ed. 1234; and Swayne & Hoyt v. United States, 1937, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659.

This provision of applicable law requires the Administrator (or Acting Administrator) to himself make the actual decision. Section 8 of the Administrative Procedure Act providing for initial decisions, findings and conclusions by subordinates, does not affect the above noted requirement, and section 12 of the latter act specifically states that "Nothing in this Act shall be held to * * * limit or repeal additional requirements imposed by statute * * *."[43] The requirement that the Administrator make the actual decision does not proscribe the assistance, expertise, and recommendations of his subordinates... His would otherwise be an impossible task. Within this area of permissible reliance, the options of procedure granted agencies and the limits imposed upon them by the Administrative Procedure Act control. Thus hearing officers in cases of adjudication, and other subordinates as well in cases of rule-making, may make and draw findings of fact, conclusions of law and recommended or initial decisions. The Administrator need examine the record only so far as to exercise an independent judgment, but this does not preclude reliance upon findings, supported by substantial evidence, and prepared by competent subordinates.[44] He may reject, modify or accept the findings and conclusions, in whole or in part, but acceptance does not indicate a failure to perform the duty imposed upon him by law. Congress did not intend to make of him another trial examiner, requiring of him new findings of fact de novo on the record. His burden is making the ultimate decision on policy based upon the facts so found.

Both the first and second hearings culminating in the respective First and Second Orders were conducted by the same trial examiner. We entertain no doubt respondent Kingsley had the benefit of any differences in the evidence at the two hearings. His references in the supplemental findings to portions of the evidence taken at the first hearing disclose to us, in the absence of *proof* to the contrary, that he sufficiently examined all necessary evidence. Further, the evidence to be taken on our order of remand was solely upon the narrow issue whether the alleged new method (blanching) of preparing oysters for canning justified any modification of the First Order. However, as we have said, we are sufficiently convinced that all proper evidence, both of the first and second hearings received adequate consideration at the hands of the Administrator and the Acting Administrator.

Furthermore, we cannot allow the Administrator's recitation that he has personally examined and considered the evidence in making his decision to be successfully challenged by a mere allegation in a brief. We have neither moral nor legal right to presume that only those who occupy judicial office respect their obligations and perform their official duties honestly, sincerely and conscientiously. Nor can we presume the subordinate personnel to be a camarilla. It requires more than mere allegation (or affidavit on information and belief, which is not even found here) to upset the presumption of validity attaching to public proceedings and the formal recitations of public officials.[45]

---

[43] See Attorney General's Manual on the Administrative Procedure Act, p. 139, re section 12.

[44] In the first Morgan case, 1936, 298 U.S. 468, 481–482, 56 S.Ct. 906, 912, 80 L.Ed. 1288, the Court stated: "* * * the officer who makes the determinations must consider and appraise the evidence * * *" but, "This necessary rule does not preclude practicable administrative procedure in obtaining the aid of assistants in the department. Assistants may prosecute inquiries. Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates."

[45] N. L. R. B. v. Ford Motor Co., 9 Cir., 1941, 118 F.2d 766; N. L. R. B. v. Biles Coleman Lumber Co., 9 Cir., 1938, 98 F.2d 16; N. L. R. B. v. Lane Cotton Mills Co., 5 Cir., 1940, 108 F.2d 568, 569; N. L. R. B. v. Botany Worsted Mills, 3 Cir., 1939, 106 F.2d 263; Cupples Company Manufacturers v. N. L. R. B., 8 Cir., 1938, 103 F.2d 953, 957; Cf. Twin City Milk Producers Ass'n v. McNutt, 8 Cir., 1941, 122 F.2d 564, Id., 8 Cir., 1941, 123 F.2d 396; Columbia Cheese Co. v. McNutt, 2 Cir., 1943, 137 F.2d 576, 580.

## Standard of Identity

Petitioner also urges that to permit packers of Eastern and Southern oysters (ostrea virginica) the option of either labeling their product "Cove Oysters," or "Oysters," while requiring Western canners of the so-called "ostrea gigas" to label their product "Pacific Oysters," is to "unreasonably" give exclusive use of the generic term "oysters" to the Eastern and Southern packers when that term applies equally to both. With this we are inclined to agree.

The Food and Drug Act, 21 U.S.C.A. § 341, permits the Administrator to promulgate a *reasonable* definition and standard of identity "for any food, under its common or usual name so far as practicable."[46] There is some evidence in the record to support the contention that the Western oyster (ostrea gigas) is known as the "Pacific oyster" even though this geographic term would seem to include the smaller native "Olympia" oyter (ostrea lurida) and even though the so-called Pacific oysters canned by petitioner have for years been known locally as "Japanese oysters."[77] Such evidence showing that ostrea gigas are known as "Pacific" oysters we may accept. However, if the order is "not in accordance with law," i.e., "unreasonable," see Section 341, supra, 21 U.S.C.A. § 371(f) (3), or is "arbitrary. capricious, an abuse of discretion, or not otherwise according to law," Administrative Procedure Act, § 10 (e) supra, it must be set aside.

The Second Order, insofar as it related to standard of identity, was but a restatement of the First Order, and thus there is in effect but one order relating to standard of identity. It purports to regulate the entire oyster industry, thus on review it must be examined in the light of, and viewed against, the background of the entire industry. Even though a portion of an order, lifted from context, may be supported, we think that it may be extremely arbitrary, capricious and unreasonable when examined in the light and against the background of the order's entire effect. Such is the situation we find here.

Permitting one segment of a sea food industry to enjoy the exclusive use of a term naturally associated with and normally applied to an article of food in common use under a common name without the most cogent reasons directly pertinent to the protection of the consuming public, appeals to us as being outside the bounds of reason and fairness. A purchaser who inspects the two products side by side, one labeled "Oysters," the other "Pacific Oysters," would probably be left with the impression that the latter are in some form atypical, possibly not a true member of the oyster family. We think that the danger inherent in such a situation makes it manifestly unfair to that portion of the industry discriminated against, and to that extent we regard the requirement as arbitrary, capricious and an abuse of discretion. The requirement as to "Standard of Identity" is therefore set aside.

The foregoing disposition of the issues in this case is without prejudice to the promulgation of any further order relating to standard of identity which avoids the arbitrary discrimination above noted.

To be sure there is some evidence in the record that consumers distinguish the Eastern and Southern from the "Pacific" oysters by virtue of the large size[48] of the latter. However there is neither a scintilla nor iota of evidence in the entire record that anyone considers the Eastern and Southern product only to be "oysters." Any conclusion resting upon such an assumption cannot be said to be founded upon substantial evidence, or upon any evidence at all, within the requirements of the Administrative Procedure Act, § 10(e), supra.

Our consideration and disposition of this

---

[46] Federal Security Adm'r v. Quaker Oats Co., supra, Note 42; Twin City Milk Producers Ass'n v. McNutt, supra, Footnote 45; Columbia Cheese Co. v. McNutt, supra, Footnote 45.

[47] Cf. Introduction of Japanese Oysters into the United States, Bureau of Fisheries Circular No. 12, August, 1932.

[48] We cannot remain insensible to the fact that various of the Eastern and Southern oysters, notably the Lynnhaven and Chincoteague varieties, grow to sizes which may equal that of the "Pacific" oyster.

case has been greatly aided by excellent briefs and by the able presentation of the issues by counsel for both parties.

The orders under review are ordered enforced in part in accordance with this opinion.