The **SUPERIOR OIL COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 18252.

United States Court of Appeals
Ninth Circuit.

Aug. 26, 1963.

As Amended on Denial of Rehearing
En Banc Sept. 25, 1963.

Murray Christian, H. W. Varner, and Roland B. Voight, Houston, Tex., for petitioner.

Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol., and Peter H. Schiff, Atty., F. P. C., Washington, D. C., for respondent.

Before POPE, HAMLEY and BROWNING, Circuit Judges.

HAMLEY, Circuit Judge.

This is a proceeding to review the action of the Federal Power Commission in rejecting, without hearing, certain rate-schedule and certificate-application filings. The filings had been tendered by petitioner, The Superior Oil Company (Superior). Superior is an independent producer of natural gas and is subject to Commission regulation under the Natural Gas Act (Act) 15 U.S.C. § 717 et seq. Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

On April 9, 1962, Superior entered into a casinghead gas contract with the El Paso Natural Gas Company (El Paso) covering the sale of casinghead gas produced in approximately 2,640 acres of gas in the Aneth Field in southeastern Utah. This contract incorporates by reference the terms of a twenty-year casing-

head gas contract entered into on June 11, 1958, by the same parties. This 1958 contract initially committed some 8,720 acres in the Aneth Field to El Paso,[1] but by subsequent agreements sections of 800 acres [2] and 2,560 acres [3] had been added to the contract. Nothing in the 1958 contract, which was in form amended by the 1962 contract, required or expressly permitted Superior to add acreage to that originally listed.

Among the terms incorporated in the 1962 contract by reference to the 1958 contract were certain price escalation clauses. One of these, not objected to by the Commission, called for specified price increases at five-year intervals.[4] Another provided for a price "redetermination" by the contracting parties, if requested by the seller, at each of these five year intervals.[5] A third escalation provision was a so-called favored-nation

1. On June 25 and July 7, 1958, Superior filed this 1958 contract with the Commission as its rate schedule No. 77, and in support of its application for a certificate of public convenience and necessity. Temporary authority to deliver this gas was granted by the Commission on November 18, 1958. On February 23, 1960, the Commission issued its Opinion No. 335, granting the certificate of public convenience and necessity applied for, but upon condition that the rate should be 17.7 cents per Mcf instead of 20 cents per Mcf, as proposed by Superior. Superior Oil Co., 23 F.P.C. 370, aff'd sub. nom. Texaco, Inc. v. Federal Power Comm., 5 Cir., 290 F.2d 149. In order to comply with the order, Superior filed its supplement No. 7 to rate schedule No. 77, reducing the initial price to 17.7 cents. This supplement was accepted by the Commission on September 22, 1961.

2. On February 17, 1960, Superior filed its second supplement to its original application and its supplement No. 4 to its rate schedule No. 77, to which was attached a supplemental casinghead gas contract between Superior and El Paso, dated December 30, 1959. Temporary authority to deliver from this additional 800 acres was granted by the Commission on May 19, 1960, such grant being modified on June 29, 1960.

3. On June 7, 1960 Superior and El Paso entered into a second supplemental casinghead gas contract under which the original contract was amended and supplemented by the addition of approximately 2,560 acres of land to that previously covered. On July 20, 1960, Superior filed this supplemental contract as part of its supplement No. 5 to rate schedule No. 77, and its third supplement to the application for a certificate. Temporary authority to deliver this additional gas was granted by the Commission on September 21, 1960.

An additional supplemental casinghead gas contract, entered into between Superior and El Paso on January 1, 1961, the filings on which were accepted by the Commission on February 6, 1961, resulted in the deletion from the lands covered by the original contract of approximately 1,040 acres as to which title had been lost by litigation.

4. The pricing terms of the original 1958 contract, adopted for the new acreage by the 1962 agreement called for an initial price of 20 cents per Mcf for the first five years commencing with the date of initial delivery under the original contract. It provided for a price of 21 cents per Mcf for the second five-year period, 22 cents per Mcf for the third five-year period, 23 cents per Mcf for the fourth five-year period, and 24 cents per Mcf thereafter if the contract remained in effect. The initial price was reduced to 17.7 cents per Mcf, in accordance with the condition attached to the certificate issued by the Commission for sale under the 1958 contract, as stated in note 1.

5. The price redetermination clause provides specifically:

"Seller shall have the right, at its option, to request a redetermination of the price provided in Section 7 of this Article to be paid for any one or more or all (but not part) of the periods set out in (b), (c), (d) and (e) above. Any such request made with respect to any of such periods shall be made in writing during the six (6) months immediately preceding the commencement of such period. If Seller shall make any such request, representatives of Buyer and Seller shall promptly meet and attempt to determine the then reasonable market price of the gas deliverable hereunder. In making such determination, consideration shall be given to all pertinent factors. The price so determined by Buyer and Seller shall be the price applicable during the entire period with respect to which the same was determined; provided, that if such price shall be less than the price provided in Section 7 of this Article with respect to such period, the price during

clause, wherein El Paso agreed that it would never pay Superior less than the prices it was paying "others for comparable gas delivered under comparable conditions" within a specified area.[6]

On May 25, 1962, Superior applied to the Commission for an amendment to its certificate of public convenience and necessity for the purpose of authorizing it to sell gas to El Paso pursuant to the 1962 agreement. At the same time Superior made the related rate filing which would make the rate schedules then in effect, including the existing price escalation clauses described above, applicable to gas sold from the additional acreage.[7]

By letter-order dated June 15, 1962, the Commission summarily rejected, without hearing, the May 25, 1962 filings.

In this order it was recited that the supplemental agreement of April 9, 1962, in effect incorporates by reference the terms of the contract of June 11, 1958, and therefore appears to incorporate pricing provisions other than those permitted by section 154.93 of the Commission's Regulations (18 C.F.R. [Cum.Supp.1963] § 154.93).[8] Therefore, the Commission stated in this order, the proposed rate schedule supplement and related petition to amend, were rejected "in accordance with Commission Order No. 242 * * * and section 154.100 of the Commission's Regulations. * * *" See 18 C.F.R. § 154.100.[9]

On July 9, 1962, Superior filed an application for reconsideration of the rejected supplement to the rate schedule,.

such period shall be as provided in Section 7."

6. The favored-nation clause provides:
   "Buyer agrees that the price to be paid from time to time to Seller hereunder for Residue Gas shall never be less than the price being paid by Buyer to others for comparable gas delivered under comparable conditions within the area shown on Exhibit 'B' attached hereto."

7. This latter filing was denominated Superior supplement No. 8 to its gas rate schedule No. 77.

8. Section 154.93 of the regulations, entitled "Rate schedule defined," provides in part:
   *"Provided,* That in contracts executed on or after April 3, 1962, for the sale or transportation of natural gas subject to the jurisdiction of the Commission, any provision for a change of price other than the following provisions shall be inoperative and of no effect at law; the permissible provisions for a change in price are:
   "(a) Provisions that change a price in order to reimburse the seller for all or any part of the changes in production, severance, or gathering taxes levied upon the seller;
   "(b) Provisions that change a price to a specific amount at a definite date; and
   "(c) Provisions that, once in five-year contract periods during which there is no provision for a change in price to a specific amount (paragraph (b) of this section), change a price at a definite date by a price-redetermination based upon and not higher than a producer rate or

producer rates which are subject to the jurisdiction of the Commission, are not in issue in suspension or certificate proceedings, and, are in the area of the price in question; *Provided further,* That any contract executed on or after April 2, 1962, containing price-changing provisions other than the permissible provisions set forth in the proviso next above shall be rejected."

9. Order No. 242, 27 F.P.C. 339, issued on February 8, 1962, promulgated the last-quoted proviso of section 154.93, and amended two other sections of the Commission's regulations, as follows (27 F. P.C. at 341):
   "§ 157.14(a) (10) *Exhibit H—Total Gas Supply Data* (v), is amended by adding a proviso at the end thereof to read:
   *"Provided, further, however,* That any contract executed on and after April 2, 1962, and filed in support of an applicant's gas supply showing will be given no consideration in determining adequacy of gas supply if it contains any price-changing provisions other than those defined as permissible in § 154.93 hereof."
   "§ 157.25 *Necessary Exhibits, Exhibit B, Contracts,* is amended by deleting all the language after the first sentence thereof, ending with the words 'Natural Gas Act', and inserting in lieu thereof the following:
   "On or after April 2, 1962, the application shall be rejected if any contract submitted in support thereof contains any price-changing provisions other than those defined as permissible in § 154.93 hereof."

complaining that the summary rejection of its certificate application and related rate schedule filing was invalid. Superior did not contend that its contract did not contain price-changing provisions proscribed by the regulations relied upon by the Commission. Nor did the company make any request for an amendment of the regulation in question which would render it inapplicable as to price-changing clauses of the kind here involved, or for a waiver of the regulation as to this sale.[10]

Since the Commission did not act on the application for reconsideration, it was denied by operation of law on August 8, 1962.[11] This petition for review followed.

Under the existing regulations, referred to above, there being no request for an amendment, waiver or repeal thereof, and no contention that the rejected filings did not contain price-changing provisions proscribed thereunder, the Commission was required to summarily reject the filings without hearing. It follows that the only real issue presented on this review is the validity of the regulations pursuant to which summary rejection was ordered.

As a basis for discussing Superior's attack upon these regulations it will be helpful to set out in detail their procedural history.

They had their inception in rule-making proceedings instituted in 1956. In the notice of this proposed rule-making, the Commission stated that it proposed to amend section 154.93 of its General Rules and Regulations (18 C.F.R. § 154.93) relating to the filing of rate schedules by independent producers, to describe certain types of contracts for the sale of natural gas which would not be accepted for filing as rate schedules.

The Commission's specific proposal was that it would not accept for filing contracts containing provisions calling for price adjustments stemming from:

"(a) escalation clauses based on price indices or changes in the price received by the purchaser upon resale, or (b) the payment or offer of payment of higher prices by the purchaser or other purchasers in the same or other producing areas to the same or other sellers."

21 Fed.Reg. 2389 (1956)

The Commission, in its notice, invited comments on or before June 1, 1956, and stated that it would not act prior to that date. Numerous responses were received by the Commission, including a protest from Superior. No further public action was taken in this rule-making proceeding until March, 1961. The record does not disclose the reason for the delay.

On March 3, 1961, Pure Oil Co., 25 F.P.C. 383, was decided in which it was held, among other things, that, for a number of stated reasons, the two-party favored-nation clauses in Pure Oil Company's contract with El Paso, and in-

---

Section 154.100 of the Commission's regulations reads:
"The Commission reserves the right to reject any rate schedule or material submitted for filing which fails to comply with the requirements of §§ 154.92 through 154.99."

10. At this time, the Commission's Rule § 1.7(b), 12 Fed.Reg. 8473 (1947), expressly provided procedures whereby interested persons could seek amendment or repeal of rules. There was then no express provision with regard to obtaining waiver of a Commission rule. In our opinion, however, such a procedure was then implicitly provided for by § 1.7(a) of the Commission rules. This subsection pro-

vides generally for "(p)etitions for relief under any statute or other authority delegated to the Commission. * * *" Our view as to this accords with that expressed by the Commission on September 20, 1962, in explaining an amendment to § 1.7(b), adopted at that time, wherein express reference to "waiver" relief was first incorporated into the rule. See Order No. 255, Docket No. R–222, 27 Fed. Reg. 9499 (1962). Rule § 1.7(b) was again amended on November 6, 1962. See Order No. 255, amended, Docket No. R–222, 27 Fed.Reg. 11001 (1962).

11. See section 19(a) of the Act, 15 U.S.C. § 717r.

definite escalation clauses generally, are contrary to the public interest.[12]

In its Pure Oil decision the Commission concluded that it could not strike, as void or voidable, such clauses from Pure Oil Company's existing contracts. But the Commission announced its purpose to deal with the problem by issuing, for future application, regulations in appropriate Commission proceedings, including the rule-making proceedings which had been instituted in 1956.

In keeping with this announcement in the Pure Oil decision, the Commission on March 3, 1961, which was the day on which that decision was issued, filed its Order No. 232, in the rule-making proceeding (25 F.P.C. 379). After reciting the history of the rule-making proceeding, the Commission made certain general findings followed by several decretal provisions. These provisions added to the definitions contained in section 154.91 (a) of the Commission's General Rules and Regulations (18 C.F.R. § 154.91(a)), definitions of the terms "definite escalation clause," and "indefinite escalation clause," and added a proviso at the end of section 154.93, *Rate schedule defined.* The result was to declare inoperative, and of no effect at law, indefinite escalation clauses, as defined, contained in contracts tendered for filing on and after April 3, 1961.

Order No. 232 provided that any interested party might submit to the Commission, on or before March 20, 1961, views or comments in writing concerning these rule amendments. Interested persons did submit views and comments in response to this invitation, although none were filed by Superior. On March 31,

1961, upon consideration of these comments, and upon its own further consideration, the Commission issued its Order No. 232 A, modifying the amendments promulgated by Order No. 232 (25 F.P.C. 609).

In Order No. 232 A, the Commission reaffirmed the findings contained in its Order No. 232, that the use of long-term contracts for the sale of natural gas by producers to pipelines or to others is desirable and appropriate in the public interest but that indefinite escalation provisions are, in general, contrary to the public interest. The Commission stated, however, that it appears that elimination of all indefinite escalation provisions, as accomplished by Order No. 232, would be too restrictive to enable the industry adequately to cope with possible changing economic conditions over the span of long-term contracts. The Commission therefore concluded that, to allow for pricing flexibility and to provide an incentive for long-term contracts, it should permit future contracts to contain limited price-redetermination provisions, invocable not more than once in every five-year contract period and based upon rates subject to the Commission's jurisdiction.

Giving effect to this change of view, the Commission amended the findings contained in Order No. 232 pertaining to indefinite escalation clauses and the need of regulations governing such clauses. It also withdrew from section 154.91(a) the definitions of "definite escalation clause," and "indefinite escalation clause," which Order No. 232 had added to its regulations, and amended the proviso which that order had added to section 154.93, *Rate schedule defined,* to read in pertinent part as set out in the margin.[13]

---

12. This Commission decision was affirmed. Pure Oil Co. v. Federal Power Comm., 7 Cir., 299 F.2d 370. Indefinite escalation clauses generally include, in addition to two-party favored-nation clauses of the kind included in the Pure Oil Company contract, three-party favored-nation clauses, periodic escalation clauses, redetermination clauses, spiral escalation clauses, and other similar types of clauses. These various kinds of clauses are defined in Pure Oil Co., 25 F.P.C. 383, 388, note 3.

13. *"Provided,* That in contracts executed on or after April 3, 1961, for the sale or transportation of natural gas subject to the jurisdiction of the Commission, any provision for a change of price other than the following provisions shall be inoperative and of no effect at law; the permissible provisions for a change in price are:

The result was that, effective as to contracts for the sale or transportation of natural gas executed on or after April 3, 1961, all price changing provisions were determined in advance to be inoperative and of no effect at law, except those falling within the three numbered clauses specified in the proviso, quoted in note 13.[14]

On October 10, 1961, the Commission initiated new rule-making proceedings. In its notice to interested persons, including natural gas companies, the Commission noted the amendment of section 154.93 of its regulations accomplished by Order 232 A, and then stated:

> "Having found in Order No. 232 A that indefinite escalation provisions * * * are generally undesirable, unnecessary and incompatible with the public interest for the due and proper development of natural gas service by natural gas companies * * * it appears that no useful purpose can be served by the Commission's acceptance of contracts containing indefinite price escalation provisions or of applications relying upon contracts having such provisions as proof of the applicants' gas supply."

26 Fed.Reg. 9732, 1961.

The specific amendments proposed, as set out in this notice were substantially the same as those eventually adopted in Order No. 242, described below. The Commission, in its notice, invited comments on or before November 13, 1961. Numerous responses were received, both in support of, and in opposition to, the proposed amendments. Superior filed a timely comment in which it took the position that the proposed amendments are unlawful and exceed the powers granted to the Commission under the Act; contrary to the public interest; unnecessary; prematurely proposed; and arbitrary, unreasonable and discriminatory.

In this rule-making proceeding the Commission, on February 8, 1962, issued Order No. 242 (27 F.P.C. 339). In that order the Commission promulgated certain amendments to its regulations providing for: (1) the rejection of contracts containing indefinite price escalation clauses (now called "price-changing provisions") of the kind outlined in Order No. 232 A, (2) the rejection of applications for certificates of public convenience and necessity relying for a gas supply upon contracts containing such indefinite escalation provisions, and (3) the Commission's refusal to consider such contracts submitted in support of certificate applications by pipeline companies.[15]

---

"(1) provisions that change a price in order to reimburse the seller for all or any part of the changes in production, severance, or gathering taxes levied upon the seller;

"(2) provisions that change a price to a specific amount at a definite date; and

"(3) provisions that, once in five-year contract periods during which there is no provision for a change in price to a specific amount [paragraph (2)], change a price at a definite date by a price-redetermination based upon and not higher than a producer rate or producer rates which are subject to the jurisdiction of the Commission are not in issue in suspension or certificate proceedings, and are in the area of the price in question."

14. Sun Oil Company thereafter filed with the Commission an application for a rehearing with regard to Orders Nos. 232

and 232A. The application was rejected by the Commission and Sun Oil Company filed a petition for review in the Fifth Circuit Court of Appeals. That court dismissed the application, holding that Orders Nos. 232 and 232A are not determinative of status, do not adjudge rights or obligations nor direct the taking or refraining from any particular action, and are therefore not subject to review under the Act. Sun Oil Co. v. Federal Power Comm., 5 Cir., 304 F.2d 293, 294, cert. denied, 371 U.S. 861, 83 S.Ct. 118, 9 L. Ed.2d 99.

15. These amendments were accomplished by amending, effective April 2, 1962, Parts 154 and 157, subchapter E, chapter I, of Title 18 of the Code of Federal Regulations, to add the last proviso now contained in section 154.93 (quoted in note 5 above), and to amend sections 157.14(a) (10), and 157.25, as quoted in note 6, above.

608

In promulgating these amendments the Commission purported to act pursuant to authority granted by the Act, and particularly sections 4, 5, 7 and 16 thereof, (15 U.S.C. §§ 717c, 717d, 717f and 717o). See 27 F.P.C. 339. In Order No. 242, the Commission indicated its adherence to the findings and conclusions contained in its Pure Oil decision, and in Order No. 232 A to the effect that indefinite escalation clauses are contrary to the public interest. The Commission also reëmphasized the view, previously expressed in the Pure Oil decision and Order No. 232 A, that filings under such clauses have unreasonably burdened the Commission.[16]

A number of producers, including Superior, filed applications for rehearing of Order No. 242. These were denied on April 4, 1962 (27 F.P.C. 666).[17]

Having set out the procedural history of the Commission regulations pursuant to which the Commission summarily rejected the filings in question, we now turn to a discussion of the arguments advanced by Superior in attacking the validity of those regulations.

Superior contends that the amended form of section 154.93 of the regulations, upon which the Commission relied in rejecting Superior's filings, is invalid because Superior was not accorded an evidentiary hearing in connection with the issuance of Order No. 242, which promulgated the critical amendment to that regulation.[18] Superior urges that failure to grant such a hearing not only violates the Act, but also denies due process of law, as guaranteed by the Fifth Amendment.

The Act does not specify the procedures to be followed by the Commission in prescribing or amending rules and regulations, but provides only the general authority to prescribe, issue, make, amend and rescind them. See section 16 of the Act, 15 U.S.C. § 717o. The procedures to be followed in prescribing or amending administrative rules and regulations, including those of the Commission, are dealt with in section 4 of the Administrative Procedure Act, 5 U.S.C. § 1003, to which Superior makes no reference. The procedures followed by the Commission which led to the issuance of Order No. 242, amending section 154.-93 of the regulations, as described above,

---

16. As to this the Commission said in Order No. 242:

"Filings under indefinite escalation clauses have created a significant portion of the administrative burdens under which this Commission is laboring today. The Natural Gas Act contemplates that rate increases shall be sought when there is economic justification but not that there shall be a chain reaction in a wide area whenever one producer in the area negotiates a contract at a new price level. The act requires the Commission to give precedence to the hearing and decision of rate increases, but the complexity of indefinite price clauses requires it to spend an undue amount of time in their interpretation and application at the expense of making a prompt determination of the rate issues involved. Accordingly, in protecting the public against waves of increases which have no defensible basis, we also serve the need—which we believe we should take into account—of making the tasks of regulation more manageable."

17. Six petitions for review of that order were thereafter filed. In each case the Commission moved to dismiss on the ground that the order was not reviewable prior to a specific application. Responsive to such motions one of these petitions for review was dismissed by the Third Circuit on July 17, 1962. Shell Oil Co. v. Federal Power Comm. (not reported). Three of these petitions were dismissed by the Fifth Circuit on August 14, 1962. Hunt Oil Co. v. Federal Power Comm., 5 Cir., 306 F.2d 878. The remaining two petitions were dismissed by the Tenth Circuit on May 20, 1963. Texaco, Inc. (Pan American Petroleum Corp.) v. Federal Power Comm., 10 Cir., 317 F.2d 796.

18. This was the addition of the final proviso, reading:

"*Provided further*, That any contract executed on or after April 2, 1962, containing price-changing provisions other than the permissible provisions set forth in the proviso next above shall be rejected."

27 F.P.C. at 340.

comport fully· with the requirements of that statute.

■ In legislation, or rule-making, there is no constitutional right to any hearing whatsoever. Bowles v. Willingham, 321 U.S. 503, 519, 64 S.Ct. 641, 88 L.Ed. 892; Willapoint Oysters, Inc. v. Ewing, 9 Cir., 174 F.2d 676, 694, cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527.

Superior contends that section 154.93 of the regulations, and section 154.100, as applied here, are invalid, because, assuming that the Commission has substantive authority to reject such contract provisions (a proposition which Superior denies and which will be discussed below), such authority must stem from sections 4, 5 and 7 of the Act, 15 U.S.C. §§ 717c, 717d and 717f, each of which requires the Commission to act only after hearing, and no hearing was accorded Superior.

Superior's amendment to its certificate application, filed May 25, 1962, for the purpose of including therein Superior's interest in the 2,690 additional acres of gas dedicated to El Paso by the contract of April 9, 1962, was filed pursuant to section 7(c) of the Act, 15 U.S.C. § 717f (c).

Under that section, with exceptions not here relevant, no natural gas company may engage in the transportation or sale of natural gas, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such company a certificate of public convenience and necessity issued by the Commission authorizing such· acts or operations. This section further·provides that, except in the case of so-called "grandfather" rights, or temporary certificates, the Commission shall set any application for such a certificate for hearing, the application to be decided, and the certificate to be issued or denied according to the procedure provided in section 7(e) of the Act, 15 U.S.C. § 717f(e). Section 7 (e) specifies the standards to be applied in determining whether a certificate should issue and provides that the Commission may attach reasonable terms and conditions.[19]

Superior's notice of change in rate schedule No. 77 (supplement No. 8), was also filed on May 25, 1962. This was done, as heretofore stated, pursuant to section 4(d) of the Act, 15 U.S.C. § 717c (d), and for the purpose of applying, to the newly-dedicated acreage, the existing rates and contract rate provisions then in effect between Superior and El Paso. Under section 4(e) of the Act, 15 U.S.C. § 717c(e), the Commission is given authority to enter upon a hearing concerning the lawfulness of rates, charges, classifications, or service described in a section 4(d) filing, and, after full hearings, may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. The authority of the Commission to issue orders with regard to· rates, charges, classifications, or services already, in effect, and providing for hearings, is set out in section 5(a) of the Act, 15 U.S.C. § 717d(a).

Superior represents that, if given an opportunity at a hearing, it would show that the particular price-changing clauses

19. "(e) Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power ,to attach to the issuance of the certificate and to the exercise of the rights granted, thereunder such reasonable terms and conditions as the public convenience and necessity may require."

contained in its contract with El Paso have a definite relation to the economic requirements of Superior and to the economic conditions of the country and of the industry. It would further show, the company asserts, that the circumstances of Superior's operations in general and in the Aneth Field not only justify but require this type of indefinite pricing provision if there is to be any relation between the price for which Superior files in the future and the economic conditions then existing, and the economic requirements of Superior. Its evidence would conclusively demonstrate, Superior states, that the particular types of flexible pricing provisions used in its contracts are much more closely related to economic conditions and requirements than are the price provisions permitted under Order No. 242.

The substantive authority of the Commission to change contracts, if it exists at all,[20] stems from sections 4, 5 and 7 of the Act, as the Commission concedes. Those sections, as the text quoted above indicates, require that in proceedings involving particular rate and certificate filings, had for the purpose of exercising those substantive rights, a hearing must be accorded. But the precise question here is whether the Commission is limited, in the exercise of this substantive authority, to *ad hoc* proceedings under

sections 4, 5 and 7, wherein hearings are concededly required, or whether it may, at least to the extent represented by the specific regulations here involved, exercise that substantive authority pursuant to its rule-making authority under section 16 of the Act, 15 U.S.C. § 717$o$.[21]

The specific regulations here invoked are those under which price redetermination clauses and favored-nation clauses of the kind contained in the Superior-El Paso contract,[22] were determined in advance to be contrary to the public interest and filings containing them were made subject to summary rejection without hearing. We are not here concerned with the validity of those regulations insofar as they may affect price-changing clauses of a kind not involved in this proceeding.[23]

In our opinion United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 730, requires us to hold that to the extent here exercised, and assuming existence of substantive authority, the Commission had power to provide by rule for summary rejection of rate and certificate filings, and was not required to exercise such authority through the medium of *ad hoc* proceedings under sections 4, 5 and 7, wherein hearings would have been required.

Storer involved the Communications Act of 1934, as amended, 47 U.S.C. § 301

20. To be discussed below.

21. Section 16 reads, in pertinent part:
    "The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. * * * For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of per-

sons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours. June 21, 1938, c. 556, § 16, 52 Stat. 830."

22. See notes 5 and 6.

23. The desirability of confining this question to the specific price-changing clauses here in question is demonstrated by what has happened in another proceeding pending before the Commission. In Atlantic Ref. Co., F.P.C. Docket No. CI 63–576, the Commission, on February 21, 1963, granted a rehearing to consider whether the regulations here invoked should be modified to permit escalation clauses in producer contracts which allow producers to change the price under a particular contract at will.

et seq. Prior to November, 1953, Storer Broadcasting Co. owned or controlled five television broadcast stations. Proceeding under section 308 of the Communications Act, 47 U.S.C. § 308, the company applied to that Commission for a license to operate a sixth television station at Miami, Florida.

On November 25, 1953, while that application was pending, that Commission, exercising its rule-making power under sections 4(i) and 303(f) and (r), 47 U.S.C. §§ 154(i), 303(f) and (r) of the Communications Act, amended its Rule § 3.636 with regard to multiple ownership of television broadcasting stations. Under the rule, as amended, it was provided, among other things, that no license for a television broadcast station shall be granted to any party who owns any other television broadcasting station "if the grant of such license would result in a concentration of control of television broadcasting in a manner inconsistent with public interest, convenience, or necessity." (351 U.S. at 194, n. 1, 76 S.Ct. at 765–766, 100 L.Ed. 730) The amended form of the rule also contained a provision declaring that ownership or control of more than five television broadcasting stations would be considered to be a "concentration of control contrary to the public interest, convenience or necessity." [24] (Id.)

On the day this rule amendment was promulgated, the Federal Communications Commission, on the basis of the amended rule dismissed, without hearing, Storer's pending application for a sixth television station at Miami.

Storer sought a review, in the Court of Appeals for the District of Columbia, of the order promulgating the rule amendment pursuant to which its application was denied. It contended that this rule, as amended, was in conflict with the statutory mandates that applicants should be granted licenses if the public interest would be served and that applicants must have a hearing before denial of an application. The statutory provisions relied upon by the company were section 309(a) and (b) of the Communications Act, as they existed prior to 1960.[25]

The Court of Appeals struck out, as contrary to § 309(a) and (b), as they then existed, the provision added to Rule § 3.636 declaring that ownership or control of more than five television broadcasting stations would be considered to be a concentration of control contrary to the public interest, convenience or necessity (Storer Broadcasting Co. v. United States, 95 U.S.App.D.C. 97, 220 F.2d 204).

The Supreme Court reversed, holding that the hearing requirement of then sec-

---

24. The Communications Commission's Rules 1.361(c) and 1.702 permit applicants to seek amendments and waivers of or exceptions to its rules. See 351 U.S. at 201, n. 10, 76 S.Ct. at 769–770, 100 L.Ed. 730.

25. Section 309(a) and (b), 47 U.S.C. § 309 (a) and (b) which have undergone amendment since 1955 then read (351 U.S. at 195, n. 5, 76 S.Ct. at 766, 100 L.Ed. 730):

"(a) * * * If upon examination of any application provided for in section 308 of this title the Commission shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application."

"(b) * * * If upon examination of any such application the Commission is unable to make the finding specified in subsection (a) of this section, it

shall forthwith notify the applicant and other known parties in interest of the grounds and reasons for its inability to make such finding * * *. Following such notice, the applicant shall be given an opportunity to reply. If the Commission, after considering such reply, shall be unable to make the finding specified in subsection (a) of this section, it shall formally designate the application for hearing on the grounds or reasons then obtaining and shall notify the applicant * * * specifying with particularity the matters and things in issue * * *. Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate but in which both the burden of proceeding with the introduction of evidence upon the issue specified by the

tion 309(b) did not withdraw from the power of the Communications Commission the authority, under its rule-making power, to promulgate the provision limiting applicants to five television broadcasting stations. The Supreme Court recognized that the challenged rule contained limitations against licensing not specifically authorized by statute. However, such general rule-making power, the Court held, is not limited to specific authorizations, but extends to matters not inconsistent with the Communications Act or law.

The Supreme Court further stated, in Storer (351 U.S. pages 203–205, 76 S.Ct. pages 770–772, 100 L.Ed. 730):

"This Commission, like other agencies, deals with the public interest. Scripps-Howard Radio v. Federal Communications Comm., 316 U.S. 4, 14, [62 S.Ct. 875, 86 L. Ed. 1229.] Its authority covers new and rapidly developing fields. Congress· sought to create regulations for public protection with careful provision to assure fair opportunity for open competition in the use of broadcasting facilities. Accordingly, we cannot interpret § 309(b) as barring rules that declare a present intent to limit the number of stations consistent with a permissible 'concentration of control.' It is but a rule that announces the Commission's attitude on public protection against such concentration. The Communications Act must be read as a whole and with appreciation of the responsibilities of the body charged with its fair and efficient operation. The growing complexity of our economy induced the Congress to place regulation of businesses like communication in specialized agencies with broad powers. Courts are slow to interfere with their conclu-

sions when reconcilable with statutory directions. We think Multiple Ownership Rules, as adopted, are reconcilable with the Communications Act as a whole. An applicant files his application with knowledge of the Commission's attitude toward concentration of control.

\*     \*     \*     \*     \*     \*

" \*  \*  \* We read the Act and Regulations as providing a 'full hearing' for applicants who have reached the existing limit of stations, upon their presentation of applications conforming to Rules 1.361 (c) and 1.702, that set out adequate reasons why the Rules should be waived or amended. The Act, considered as a whole, requires no more. We agree with the contention of the Commission that a full hearing, such as is required by § 309(b), n. 5, supra, would not be necessary on all such applications. As the Commission has promulgated its Rules after extensive administrative hearings, it is necessary for the accompanying papers to set forth reasons, sufficient if true, to justify a change or waiver of the Rules. We do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing. If any applicant is aggrieved by a refusal, the way for review is open." (Footnotes omitted.)

There is no substantial difference between the statutes involved in Storer and those involved in the case before us, insofar as hearing requirements and rule-making authority are concerned. As in the case of the rules of the Federal Communications Commission, the Federal Power Commission regulations permit applicants to seek amendment, waiver or repeal of its rules.[26] In Storer, as well as here, the effect of the rule, as applied,

Commission, as well as the burden of proof upon all such issues, shall be upon the applicant."

26. As pointed out in footnote 10, the Federal Power Commission's Rules in effect at that time provided expressly for the

amendment or repeal of rules, and implicitly for their waiver. The Federal Communications Commission's rules in effect at the time Storer was decided provided expressly for amendment, repeal or waiver of that Commission's rules. See Unit-

was to occasion summary denial of the application without hearing.[27]   In Storer as well as here, the rule under attack represented an exercise of substantive authority.[28]  Indeed, it was only because the rule there challenged was found to affect Storer's substantive rights that the Supreme Court held that the company had standing to petition for review of that rule.

Seeking to distinguish Storer, Superior points out that section 314 of the Communications Act of 1934, 47 U.S.C. § 314, expressly forbids ownership or control of stations where the purpose or the effect thereof might be to substantially lessen competition or to restrain commerce.  It is argued from this that the Communications Commission was clearly authorized to promulgate rules to further the Congressional directive expressed in the Act.

This argument, however, goes only to the question of whether the Commission has substantive authority to reject applications which contain the proscribed price-changing clauses, whether by *ad hoc* proceedings or by general rule-making—a question to be explored below. The requirements of the Communications Act with respect to the necessity of hearings are just as firm as in the Natural Gas Act.  If the Communications Act requirements did not foreclose substantive regulation by means of rule-making un-

der the circumstances of Storer, we do not perceive why the Natural Gas Act requirements do so under the circumstances of this case.

Superior also notes that the Communications Act involves the use of the public domain and does not pertain to rate regulation, whereas the property rights of natural gas companies are being subjected to regulation under the rate and certificate provisions of the Natural Gas Act.  Accordingly, Superior argues, under the Communications Act there can be no question of confiscation of private property protected by the Fifth Amendment, whereas under the Natural Gas Act, the protection against confiscation is clear.

But again, we are not at this point considering the constitutionality of the challenged Federal Power Commission regulation, but only its validity in view of the provisions of the Act relating to the necessity for hearings.  Of course if the regulations in question are unconstitutional, a question to be considered below, they cannot stand whether or not in conflict with statutory provisions pertaining to hearings.

Superior cites a number of decisions which it believes support the view that the regulations in question violate provisions of the Act relating to hearings.[29] None of these cases represented Com-

---

ed States v. Storer Broadcasting Co., 351 U.S. 192, 202–203, note 10, 76 S.Ct. 763, 770, 100 L.Ed. 1081.

27.  In Storer, the application which was so denied was pending when the rule amendment was promulgated, whereas here, the filings in question were not pending, nor had the supplemental contract upon which they were based been executed when Order No. 242 was issued on February 8, 1962.

28.  In Storer the Supreme Court observed (351 U.S. pages 199–200, 76 S.Ct. pages 768–769, 100 L.Ed. 730):

"The regulations here under consideration presently aggrieve the respondent.  The Commission exercised a power of rulemaking which controls broadcasters.  The Rules now operate to control the business affairs of Storer. Unless it obtains a modification of this

declared administrative policy, Storer cannot enlarge the number of its standard or FM stations.  It seems, too, that the note to Rule 3.636 (n. 1, supra) endangers Storer's stations as alleged in its petition for review.  See this opinion, supra, [351 U.S.] p. 197, at (b) [76 S.Ct. p. 767, 100 L.Ed. 730]. Commission hearings are affected now by the Rules.  Storer cannot cogently plan its present or future operations. It cannot plan to enlarge the number of its standard or FM stations, and at any moment the purchase of Storer's voting stock by some member of the public could endanger its existing structure.  These are grievances presently restricting Storer's operations. * * *." (Footnotes omitted.)

29.  Principal among these are Atlantic Refining Co. v. Public Service Comm. (Cat-

mission action based upon a general rule, applied prospectively, in which the Commission had given concreteness to a standard of public interest. We have no doubt that, absent such a rule, or absent Commission action reasonably based thereon, the Commission may not rule adversely upon rate and certificate filings without granting a hearing of the kind specified in sections 4, 5 and 7. But that is not our case.

We are mindful of the fact that the Tenth Circuit has recently held Order No. 242 void and without effect. Texaco, Inc. (Pan American Petroleum Corp.) v. Federal Power Comm., 10 Cir., 317 F.2d 796, decided May 20, 1963.[30] That court appears to have reached this conclusion at least partly on the ground that Order No. 242 violates sections 4, 5 and 7 of the Act, in which hearings are provided for. Since, for the reasons indicated, we regard Storer as controlling on the question of the statutory necessity for a hearing, we respectfully decline to follow the Pan American decision.

Superior argues that, apart from the hearing requirements of sections 4, 5 and 7 of the Act, the summary rejection of its rate and certificate filings denied it procedural due process of law guaranteed by the Fifth Amendment, since due process entitled it to a hearing.

This constitutional question was not expressly raised in Storer. Nevertheless, it seems to us that decision, by implication, calls for rejection of Superior's argument. If the explicit amendment and repeal provisions and the implicit waiver provision of the agency's rules are sufficient to meet the requirements of the express statutory provisions pertaining

to hearings (and we have held that they are), it would seem that they are also sufficient to meet the procedural requirements of the Due Process Clause of the Fifth Amendment.

Order No. 232 A brought about the rule amendment by means of which the Commission determined, for prospective application, that certain kinds of price-changing clauses are contrary to the public interest. The rule amendment thereby accomplished thus gave specificity, in a particular area, to the statutory standard of public interest. Assuming that the Commission had substantive authority to promulgate this amendment (to be inquired into below), the rule had the same function and effect as if it were a statute proscribing, in the same explicit terms, the described price-changing provisions. So viewed, and absent special circumstances that would have warranted a request for amendment, repeal or waiver thereof, the application in a particular case of the explicit standard stated therein no more entitled persons affected to an evidentiary hearing as to the general merit of the standard than would have been the case if this concreteness had been expressed in the statute itself.

That an evidentiary hearing would not have been necessary in the latter case is made clear in Denver Union Stock Yard Co. v. Producers Livestock Marketing Association, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771. The court there pointed out that the need for an evidentiary hearing, present when it is proposed to apply a statute couched in general terms, does not exist where the statute defines a duty in explicit terms.[31] For the reasons stated above, we regard this principle as

co), 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed. 2d 1312; United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div. (Memphis), 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed. 2d 153; Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037; Willmut Gas & Oil Co. v. Federal Power Commission, 111 U.S.App.D.C. 49, 294 F.2d 245, cert. denied, 368 U.S. 975, 82 S.Ct. 477, 7 L.Ed. 2d 437; and Mississippi River Fuel Corp. v. Federal Power Comm., 3 Cir., 202 F.2d

899, dismissed on motion of petitioner, 345 U.S. 988, 73 S.Ct. 1138, 97 L.Ed. 1397.

30. The Tenth Circuit held that Orders Nos. 232 and 232 A are in a different category because they are only advisory declarations of Commission policy and determine no rights.

31. In the Denver Union Stockyard case, the Court said, 356 U.S. at page 287, 78 S.Ct. at pages 741–742, 2 L.Ed.2d 771:
"When an Act condemns a practice

applicable to the rule amendment accomplished by Order No. 232 A. The rule amendment effectuated by Order No. 242, providing for summary rejection of price-changing clauses proscribed under the rule promulgated by Order No. 232 A, also gave effect to this principle and, in our opinion, does not offend the Due Process Clause.

In contending that due process of law entitled it to an evidentiary hearing, Superior cites a number of decisions which we now notice.

The most recent of these is Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307, sustaining the validity of certain rules of procedure adopted by the Commission on Civil Rights. We find nothing in this opinion which supports petitioner's view. The court there held that since the Commission on Civil Rights makes no adjudication but acts solely as an investigative and fact-finding agency, the questioned rules of procedure under which affected persons were not afforded a hearing, do not violate the Due Process Clause.

In Hannah the Court pointed out that the requirements of due process frequently vary with the type of proceeding involved. Thus, said the Court, 363 U.S. at page 442, 80 S.Ct. at pages 1514–1515, 4 L.Ed.2d 1307, in the passage which we assume Superior relies upon, when governmental agencies "adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process."

But the rules here under challenge are not adjudicatory in nature. They do not affect any contractual right which was in existence when the rule became effective. The problem would be different if the effect of the rules was to proscribe rates already in effect.[32] Moreover, under the Commission's rules, if there are any circumstances which indicate that the schedules or contracts in question do not contain proscribed clauses, or that the rules should be amended to except price-changing clauses of a particular kind, or waived in a particular case, the applicant is afforded a hearing.

Another case relied upon by Superior is Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129. In this case, however, as was pointed out in Hannah (363 U.S. at page 451, 80 S.Ct.

that is 'unfair' or 'unreasonable,' evidence is normally necessary to determine whether a practice, rule, or regulation transcends the bounds. See Associated Press v. Labor Board [N.L.R.B.], 301 U.S. 103 [57 S.Ct. 650, 81 L.Ed. 953]; Chicago Board of Trade v. United States, 246 U.S. 231 [38 S.Ct. 242, 62 L.Ed. 683]; Sugar Institute v. United States, 297 U.S. 553 [56 S.Ct. 629, 80 L.Ed. 859]. But where an Act defines a duty in explicit terms, a hearing on the question of statutory construction is often all that is needed. See Securities and Exchange Comm'n v. Ralston Purina Co., 346 U.S. 119 [73 S.Ct. 981, 97 L.Ed. 1494] (public offering); Addison v. Holly Hill Co., 322 U.S. 607 [64 S.Ct. 1215, 88 L.Ed. 1488] (area of production). It is, of course, true that § 310 of the Act provides for a 'full hearing' on a complaint against a 'regulation' of a stockyard. That was also true of the Act involved in United States v. Storer Broadcasting Co., 351 U.S. 192 [76 S.Ct. 763, 100 L.Ed. 730]. But we observed in that case that we

never presume that Congress intended an agency 'to waste time on applications that do not state a valid basis for a hearing.' Id., [351 U.S.] at 205 [76 S.Ct. at 771–772, 100 L.Ed. 730]."

32. In Wisconsin v. Federal Power Comm., 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357, the Court, commenting upon a contention by the State of California that the Commission should have declared void, *ab initio*, spiral escalation clauses in the contracts of Phillips Petroleum Co., referred to Commission Orders Nos. 232, 232 A and 242. In this connection the Court said, 373 U.S. at page 304, 83 S.Ct. at page 1272, 10 L.Ed.2d 357:

"Further, we see no merit in California's contention. It is true that the Commission has announced *prospectively* that it would not accept for filing contracts containing such clauses, but it would have been quite a different matter for the Commission to have declared that *past* rate increases were ineffective simply because they were based on spiral provisions. * * *" (Footnote omitted.)

at page 1519, 4 L.Ed.2d 1307), the government agency made a determination in the nature of an adjudication affecting legal rights. What happened was that the Secretary of Agriculture fixed the maximum rates to be charged by market agencies at stockyards without conducting a trial-like hearing. This decision may or may not be authority for holding that the Commission cannot validly, by rule, proscribe escalation clauses which would allow producers to change the price under a particular contract at will, subject only to Commission regulations.[33] But the rules, as applied to the particular price-changing clauses involved here do not, in our opinion, partake in any degree of a maximum rate order, or a rate-freezing order, especially in view of the leeway allowed under the waiver provision to bring special circumstances to the attention of the agency.

The third Supreme Court decision relied upon by Superior in connection with the question under discussion is Northern Pacific Ry. Co. v. Department of Public Works, 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. 836. As in Morgan, however, the agency proceeding was one for the purpose of fixing rates. The Court held that in such a proceeding an order based upon a finding made without evidence or upon evidence which clearly does not support it, is a denial of due process. For the reasons stated in discussing Morgan, this decision is not in point here.

Only one of the remaining cases cited by Superior on this branch of the case warrants more than passing comment.[34] We refer to Philadelphia Co. v. Securities & Exchange Comm., 84 U.S.App.D.C. 73,

175 F.2d 808, dismissed as moot 337 U.S. 901, 69 S.Ct. 1047, 93 L.Ed. 1715.

Pittsburgh Railways, then in process of reorganization, was a "non-utility subsidiary" of The Philadelphia Company, a registered holding company, and under an S.E.C. rule, exempt from regulation under that Act. That Commission issued notice of a proposed rule which would deny exemption to a subsidiary in reorganization whose securities were guaranteed by a registered holding company. The effect of such a rule would be to remove Pittsburgh Railways' exempt status.

The agency advised interested parties that the proposed rule would be primarily applicable to Pittsburgh Railways. That Commission invited comments, views, written data and oral argument on the proposed rule, but denied Philadelphia's request for a hearing. The District of Columbia Court of Appeals held that the S.E.C. had improperly denied a trial type of hearing, holding that the agency action was adjudicatory because it was particular and immediate.

In our opinion the Philadelphia case is distinguishable from the one now before us. The regulations here in question were promulgated for general and prospective application. They were not, as in Philadelphia, directed primarily to a particular company with respect to a matter then pending. The circumstances which led the District of Columbia Circuit to hold that the proceeding was adjudicatory in nature are not present here.[35]

■ We conclude that the summary rejection, without hearing, of Superior's

---

33. It has previously been noted that the Commission is now giving consideration to a modification of its rules to permit escalation clauses of this kind. See note 23 above.

34. Thus Warren Petroleum Corp. v. Federal Power Comm., 10 Cir., 282 F.2d 312, does not appear to involve any constitutional question. National Labor Relations Bd. v. Burns, 8 Cir., 207 F.2d 437, involved an unfair labor practice proceeding, clearly ajudicatory in nature, in

which the Examiner excluded competent and material evidence. National Labor Relations Bd. v. Prettyman, 6 Cir., 117 F. 2d 786, involved the same kind of proceeding.

35. Since Philadelphia is distinguishable, we need not decide whether we would reach the same result under the facts of that case. But see 1 Davis, Administrative Law Treatise, § 7.01, pages 409–410, commenting upon that decision.

rate and certificate filings here in issue, did not deprive the company of procedural due process of law.

This brings us to a consideration of Superior's arguments directed to whether the Commission had substantive authority to proscribe the price-changing clauses in question and, if so, whether the exercise of that authority by the promulgation of the challenged rules, or in the application of those rules in this case, was in violation of the Act, unreasonable, arbitrary, capricious and discriminatory. Most of the arguments advanced under this branch of the case would have equal relevance if the Commission action had resulted from an *ad hoc* decision instead of from the application of general Commission rules.

Under the statutory scheme of the Natural Gas Act, Superior contends, independent producers have the right to enter into contracts to sell casinghead gas and, in connection therewith, to fix the initial rates for such gas and the conditions under which those rates may be changed in the future. The statute does not, Superior urges, require that future rate changes receive advance approval, or even the filing of rate proposals, but only notice to the Commission before rate changes may be put into effect. These statutory principles, Superior argues, are violated by a proscription upon price-changing clauses of the kind here in question, whether such proscription is the result of an *ad hoc* decision, or of general rule-making.

The Act permits the relations between the parties to be established initially by contract. Among the terms of such contracts are those governing the initial price to be charged. Unless there is provision in such a contract for price changes in the future, both seller and buyer are contractually bound by the initial price, and may not unilaterally obtain a price change even with the consent of the Commission. United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373.

It is therefore usual for such contracts to contain price-changing clauses. In the case of a producer, such clauses manifest the buyer's consent to a filing under section 4(d) of the Act for the purpose of effectuating a rate change in keeping with the price-changing clause. If the increase is challenged, the producer must still establish its lawfulness wholly apart from the terms of the price-changing clause. Wisconsin v. Federal Power Comm'n, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357.

When a producer, as in this case, applies to the Commission, under section 7 of the Act, for a certificate of convenience and necessity authorizing it to sell natural gas in interstate commerce, the Commission must give consideration to the initial price provided for in the contract, and other contract terms relating to initial or future prices. Atlantic Ref. Co. v. Public Service Comm. (Catco), 360 U.S. 378, 391, 79 S.Ct. 1246, 3 L.Ed.2d 1312; United Gas Improvement Co. v. Federal Power Comm., 9 Cir., 283 F.2d 817, 823, cert. denied, Superior Oil Co. v. United Gas. Imp. Co., 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 192. In Catco the Court stated that while under these circumstances, the Commission is not required to determine that the proposed initial price is just and reasonable, there should at least be "a most careful scrutiny and responsible reaction to initial price proposals of producers under § 7." 360 U.S. at 391, 79 S.Ct. at 1255, 3 L.Ed. 2d 1312. It seems to us that, in such a certificate proceeding, the Commission is likewise empowered to scrutinize and react with respect to price-changing clauses in the contract which may trigger future rate filings.

If the Commission disapproves of the proposed initial price, it may grant the certificate only on condition that the price be changed. As stated earlier in this opinion, Superior obtained its present certificate only by accepting a reduction in its proposed initial rate. See notes 1 and 4. If a natural gas company does not find such a rate condition acceptable, it is not compelled to initiate the proposed service. See Catco, 360 U.S. at 387–388, 79 S.Ct. at 1252–1253, 3

**618**

L.Ed.2d 1312. We see no reason why these principles are not as applicable to price-changing clauses in the contract filed in support of the certificate application, as to clauses therein, specifying the initial price.

We reach the same conclusion with regard to the regulation of rates under section 4 (relating to new rate filings) and section 5 (relating to rates already in effect). Section 5(a) specifically authorizes the Commission to determine the just and reasonable "rate, charge, classification, rule, regulation, practice, or *contract* to be thereafter observed and in force, and shall fix the same by order. * * * *" (Emphasis supplied.) 15 U.S.C. § 717d(a). Section 4 does not make specific references to "contracts." But section 4(e) provides that the Commission may make such orders with reference thereto "as would be proper in a proceeding initiated after it had become effective," (15 U.S.C. § 717c(e)) thereby giving application to section 5(a) quoted above.[36]

Superior calls attention to the fact that for five years, after the 1956 decision in United Gas Pipe Line Co. v. Mobile Gas Serv. Corp. (Mobile), 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373, the Commission requested, in its annual reports, legislation which would outlaw favored-nation price escalation clauses.

An unsuccessful attempt by an administrative body to secure an express grant from Congress is significant in determining whether the power so requested was conferred by the statute sought to be amended or supplemented. Federal Trade Comm. v. Bunte Bros., Inc., 312 U.S. 349, 351–352, 61 S.Ct. 580, 85 L.Ed. 881.

What was requested of Congress in the Commission's annual reports, however, went far beyond the power which the Commission exercised in promulgating the challenged regulation. The re-

quested legislation would have outlawed price escalation clauses in existing contracts, whereas the Commission regulation has only prospective application.

The Commission may well have had doubts about its power to strike such clauses from existing contracts, either by general rule or *ad hoc* decision, without having a like doubt about its power to promulgate a general rule outlawing such clauses only for the future. The fact that Congress was unwilling to set aside, by statutory fiat, existing price escalation clauses, has no tendency to establish that the Commission did not already have power to deal with the problem prospectively after administrative consideration of the respective merits of the various kinds of price escalation clauses.

We recognize that sections 4, 5 and 7, in addition to providing substantive authority with regard to certificate and rate regulation, also specify procedures to be followed, including the necessity of hearings, in exercising that authority. We have heretofore held, however, that with respect to the particular exercise of substantive authority represented by the Commission regulations here in question, that agency was free to proceed under its general rule-making power rather than case by case.

Superior contends that the proscription of the particular price-changing provisions here in question, however accomplished, is unreasonable, arbitrary, capricious and discriminatory, and that, to accomplish such proscription by general rule-making is, for that reason alone, unreasonable, arbitrary and capricious.

In Texaco, Inc. (Pan American Petroleum Corp.) v. Federal Power Comm., 10 Cir., 317 F.2d 796, the Court stated that the summary rejection, without hearing, of a contract containing price-changing clauses, pursuant to the proscription of Rule 154.93, deprived the Court of any record upon which the re-

36. In a practical sense, although perhaps not technically, only section 7 certificate authority is involved here. If the Commission, in the exercise of that authority, grants an application for a certificate only upon condition that proscribed price-changing clauses are deleted, the Commission will not be called upon to consider, under sections 4 or 5, the appropriateness of those clauses.

jection may be sustained. Pointing out that, upon motion of the Commission, Order No. 242, promulgating the amended form of rule 154.93, had been held not subject to Court review, the Court expressed the view that the Commission had, in practical effect, circumvented Court review of the basic question—the propriety of indefinite price-changing clauses.

We analyze the problem differently. In determining the propriety of rules of general application, only a legal question is presented—whether on the factual premise upon which the Commission acted, the rule promulgated is unreasonable, arbitrary, capricious or discriminatory. If the factual premise itself were open to review, then it would be necessary for all general rule-making to include a trial-like hearing. As stated earlier in the opinion, this is not required.

If there were facts which entitled Superior to a waiver of the rule, it would have been entitled to an evidentiary hearing on that question, and the factual support for any finding resulting from such a hearing would be subject to Court review. But no such hearing was here requested.

We turn to the specific grounds relied upon as showing that the rule proscribing the price-changing clauses before us, and rejecting in advance any filing containing them, is unreasonable, arbitrary, capricious and discriminatory.

Superior points out that the new filing only has the effect of applying, to the new acreage, price-changing clauses already in effect in the same contract with the same buyer (El Paso), pertaining to the same field (Aneth Field). The company argues that all facts which justified the original certificate still exist and are of greater weight since no extension of the buyer's facilities will be required to take delivery of the new gas.

Since granting the previous certificates and thereby sanctioning the same price-changing provisions, the Commission has, through its studies, experience, and its findings in the Pure Oil case, 25 F.P.C. 333, come to the conclusion that such clauses are, and impliedly always have been, contrary to the public interest. This conclusion is as applicable to clauses now in effect with respect to certificated operations as to clauses proposed to be applied to newly-dedicated areas. While the rule reaches only the latter, this was the result of a procedural choice. It does not represent a determination that, to the extent now effective, such clauses are in keeping with the public interest.

Superior argues that a price-changing provision giving the buyer's consent to the purchaser to seek rate increases is fair, reasonable and lawful. To hold otherwise, the company contends, amounts to a prejudging of unknown future conditions and facts upon unknown evidentiary standards. Superior asserts that the outlawed provisions cannot possibly result in any price which is not just and reasonable and which is not related to the economic needs of the seller, because future rate filings designed to take advantage of such provisions, are subject to section 4 of the Act.

In our opinion the Commission had a reasonable basis for proscribing price-changing provisions of the kind before us, and the determination to do so was not arbitrary and capricious.

In its Order No. 242, 27 F.P.C. 339–341, the Commission stated that it intended the proscription thereby accomplished to be "rationally related to a condition which requires correction if regulatory objectives embraced by the statute are to be achieved." (Id. at 340). This was a proper objective. See American Trucking Ass'ns v. United States, 344 U.S. 298, 310, 314, 73 S.Ct. 307, 97 L.Ed. 337.

As its principal reason for outlawing some kinds of indefinite price escalation clauses the Commission stated in its order:

" * * * Increases in producer prices, triggered by indefinite escalation clauses, have resulted in a

flood of almost simultaneous filings. These filings bear no apparent relationship to the economic requirements of the producers who file them. The Natural Gas Act contemplates that prices, to be just and reasonable, be related to economic needs. * * * "

27 F.P.C. at 340.

As an additional reason the Commission stated that the presence of such clauses in contracts on file with the Commission place such an administrative burden upon the Commission as to interfere with the performance of more important Commission functions. This portion of the Commission order is quoted in note 16 above.

In order No. 242, the Commission also referred to, and adopted, its conclusions stated in the Pure Oil case, 25 F.P.C. 383, with regard to the undesirable characteristics of such clauses. In its decision in

that case, the Commission stated that such clauses are contrary to the public interest in a number of ways. They are, the Commission said, inherently unreasonable because they may be triggered by circumstances which have nothing to do with revenue needs or the reasonableness of rates.[37] Moreover, the Commission determined in that case, such clauses have an injurious effect which cannot be fully overcome by resort to the refund provision of the Act.[38]

In the light of these Commission determinations, and with due regard to the experience, expertise, and neutral position of the Commission as a regulatory agency, we find nothing in Superior's arguments advanced here which would warrant a holding that the Commission acted unreasonably, arbitrarily or capriciously in proscribing the clauses involved in our case. Nor do we find anything in Superior's argument which would justify a conclusion that effectuation of

37. As to this, the Commission said, in its Pure Oil decision, at page 389:

"* * * As indicated previously, under Pure's provisions, the company's prices are subject to triggering if El Paso pays any other producer within the specified area a higher price. There need be no economic or other substantial justification for the increase; the mere fact that a higher price is paid to some other producer would be sufficient to activate the increase. In our view, such an artificial ground for a proposed increase, operating in such a mechanical and arbitrary manner, and lacking any substantial relationship to the factors which bear on the value of gas or on a determination of a reasonable level of rates for it, does not constitute a proper basis for filing proposed increased rates or a sufficient justification for our giving effect to such a filing, at least if the rate contained therein is in excess of those in our producer price Policy Statement 61-1, as amended. And although other types of indefinite escalation provisions are triggered by other kinds of mechanisms, they are in principle subject to these same objections." (Footnote omitted.)

38. On this point, the Commission said, at pages 389-390:

"The injury resulting from the practical effects of these clauses is exemplified by the evidence in this record. Thus, evidence adduced by El Paso indicates that escalation increases under clauses like those of Pure if activated by West Texas' sales will total some 18 million dollars annually. Furthermore, El Paso states that the filing of such increases for its gas supply will require the company to file for proposed increases in its rates. And it points out that by reason of spiral escalation clauses in its contracts with Phillips Petroleum Company, Phillips is entitled to and probably will file for an increase based upon El Paso's increase to its customers. Since Phillips will be permitted to collect this increase under refund obligation, says El Paso, once again the other producers will be entitled to file for increased rates under their escalation provisions and the cycle will start anew.[7] [7 Under contractual amendments, the spiral escalation clauses have been eliminated from Phillips' contracts.] According to El Paso, if the Pure rate increases here sought become effective, El Paso's gas purchase costs directly and indirectly will be increased in amounts ranging from $35 million to $51 million annually, in excess of El Paso's rate increases sought in its rate filing in Docket No. G-17929."

the proscription by rule-making rather than *ad hoc* decisions, itself constitutes unreasonable, arbitrary or capricious action.

Superior contends that the regulations are discriminatory because pipelines are not subjected to the same regulations.

We agree with the Commission that a mere difference in treatment, by rule, of pipelines and producers does not invalidate a regulation. Section 16 of the Act, 15 U.S.C. § 717o, specifically provides that

"* * * [f]or the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters."

Although the Natural Gas Act was enacted in 1938, the Commission did not undertake to regulate independent producers until after Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, was decided in 1954. Since then the Commission's regulations have, in large measure, accorded different treatment to independent producers than to the long-regulated pipeline companies.[39]

The Commission could well determine that there are practical differences between the operations of the two kinds of companies, which warrant different treatment with regard to price-changing clauses. Pipelines, unlike producers, do not ordinarily seek rate increases for sales to individual distributing companies, but instead file company-wide increases to reflect over-all increased costs in the operations. Such company-wide increases, moreover, are required by the applicable regulations to be supported at the time of filing by substantial cost data amounting to a full factual justification of the new rate.[40] Producers, by contrast, as the Commission points out, not only have continued to establish rates by individual contract but, in addition, their increased rate filings normally relate to such contracts or at most, to only a small portion of their total operation.

In holding that the proscription of price-changing clauses here in question is not unreasonable, arbitrary, capricious or discriminatory, we wish to once again emphasize that we so hold only with regard to the kind of clauses incorporated in the contract here at issue, and in the absence of any showing by Superior that special circumstances exist entitling it to a waiver of the rule.

Other contentions advanced by Superior, not discussed above, have been considered and determined by us to be without merit.

The Letter-Order of June 25, 1962, summarily rejecting the filings referred to therein, thereby giving effect to section 154.93 of the regulations, as amended by Order No. 242, is affirmed.

It is further ORDERED that the petition for rehearing en banc, filed herein on September 19, 1963, be and the same is hereby denied.

39. As the Commission states in its brief: "* * * Thus the filing requirements in both certificate and rate proceedings are much less detailed for independent producers than for pipelines. Compare Sections 154.1 through 154.86 of the Commission's Regulations under the Natural Gas Act, 18 C.F.R. 154.1–154.86, with Sections 154.91 through 154.103, 18 C.F.R. 154.91–103 (relating to rates); also compare Sections 157.5 through 157.22, 18 C.F.R. 157.5–157.22, with 157.23 through 157.31, 18 C.F.R. 157.23–157.31 (relating to certificates). Similarly, while a uniform system of accounts has been prescribed for pipeline companies of all sizes, none has been adopted for producers, and there are different requirements with respect to annual reports. * * *"

40. 18 C.F.R. (1963 Cum.Supp.) § 154.63.