The **SCHOOL BOARD OF BROWARD COUNTY, FLORIDA**, a body corporate, Plaintiff,

v.

**DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, UNITED STATES OFFICE OF EDUCATION**, Defendant.

No. 73-528-Civ-NCR.

United States District Court, S. D. Florida, Ft. Lauderdale Division.

Aug. 9, 1974.

Marko, Stephany & Lyons, Ft. Lauderdale, Fla., for plaintiff.

Brian K. Landsberg, Marie E. Klimesz, Asst. U.S. Attys., Dept. of Justice, Washington, D.C., for defendant.

ROETTGER, District Judge.

The School Board seeks a review of a determination by the Commissioner of Education which terminated ab initio a grant to the School Board under the Emergency School Assistance Program (P.L. 91-380). The School Board previously attempted to have the matter reviewed in the United States Court of Appeal but the petition filed there was dismissed for lack of jurisdiction. School Board of Broward County, Florida v. Department of Health, Education and Welfare, 475 F.2d 1117 (5th Cir. 1973). The decision of the Commissioner was based on the findings of a hearing examiner subsequent to an administrative hearing.

An ESAP grant had been awarded in 1970-71 to the School Board on October 6, 1970 in the amount of $772,551.00. That grant is not in issue. The School

Board applied on August 10, 1971 for a 1971–72 grant under the ESAP Program and a grant of $1,737,000.00 was awarded on September 1, 1971. The application—consisting of a staggering 68 pages—is relevant in two particular areas: (1) the nondisclosure of the sale of surplus school equipment to nonpublic schools and (2) the assurance that the faculty had been assigned on a minority-nonminority ratio equal to the ratio of the school system countywide.

On December 6, 1971 HEW notified the School Board that information obtained during a review of the School District's ESAP Program revealed there were sales to 25 nonpublic schools between May 14, 1970 and July 26, 1971. HEW asserted that four of the twenty-five nonpublic schools which purchased personal property discriminated on the basis of race or national origin. In addition HEW asserted that the School District failed to meet the requirement on current faculty assignments as to minority-nonminority ratio.

The Department further advised that it would ask the hearing examiner to determine that at the time of the application for the 1971–72 ESAP grant the School Board was not eligible for such assistance and that "said grant" should be declared void ab initio.

A hearing was held in Miami on January 12, 1972 before a hearing examiner who received testimony from a number of witnesses. Following the hearing, the hearing examiner found that although the School Board was on notice of a duty to avoid transfers of property to schools practicing discrimination, it failed to do so.[1] He also found that the School Board transferred property to Lakeview Christian School, Gold Coast Christian School, Dade Christian School, and Central Baptist School between October 6, 1970 and August 10, 1971 and

that those schools both at the time of the purchase and at the time of the hearing practiced discrimination on the basis of race.

The examiner further found that the School Board assured the Commissioner of Education that it had assigned its full-time classroom teachers for the 1971–72 year so that the ratio of minority to nonminority classroom teachers in each school was substantially the same as the ratio that existed countywide. Based on these findings, the examiner concluded that the ESAP grant approved on September 1, 1971 was void from the date of its award and the School Board of Broward County would have to repay to the government all funds received under that grant.

The School Board appealed the decision of the hearing examiner to the United States Commissioner of Education on May 11, 1972. On September 18, 1972 the Commissioner of Education set aside the finding as to the sale to Central Baptist School because it was unsupported by the evidence but affirmed the decision of the hearing examiner and ordered the School Board to repay all of the funds received under the 1971–72 grant.

## SCOPE OF REVIEW

The scope of review granted to this court by statute is severely limited to "all relevant questions of law", the interpretation of constitutional and statutory provisions, and to determine the meaning or applicability of the terms of an agency action. In addition, the court can hold unlawful and set aside agency action or findings that are found to be, among other things, unsupported by substantial evidence or arbitrary, capricious or otherwise not in accordance with law. 5 U.S.C. § 706.

---

1. The requirements of ESAP aside, the School Board had a clear duty to make a reasonable investigation of prospective purchasers of its school property. McNeal v. Tate County School District, 460 F.2d 569 (5th Cir. 1972). It failed to do this and it failed to list the sales on the application as it should have.

SALES TO NONPUBLIC SCHOOLS

A review of the proceedings before the hearing examiner convinces the court that the hearing examiner's finding that the School Board made sales of equipment to schools which discriminated on the basis of race or national original must be held unlawful and set aside. The findings are unsupported by substantial evidence for two reasons: (1) There is no substantial evidence to show that the three schools in question discriminated at the time of the sale. The evidence in the record shows a pattern of discrimination existing several months later at the time of the hearing. (2) The evidence before the hearing examiner was purely hearsay. Unquestionably, there was a mountain of evidence pointing to the fact that Lakeview Christian School, Dade Christian School, and Gold Coast Christian School discriminated on the basis of race at the time of the hearing.

■ It is not error for the hearing examiner to receive hearsay evidence. 5 U.S.C. § 556(d). However, the examiner's decision must be based upon "substantial evidence" and "mere uncorroborated hearsay or rumor does not constitute substantial evidence." Con. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). As expressed by another court: " . . . the findings, to be valid, cannot be based upon hearsay alone, nor upon hearsay corroborated by a mere scintilla." Willapoint Oysters v. Ewing, 174 F.2d 676, 691 (9th Cir. 1949). Still more recently it has been held that a " . . . decision cannot be based wholly upon insubstantial evidence not admissible under any recognized exception to the hearsay rule." Weaver v. Finch, 306 F.Supp. 1185, 1194 (W.D.Mo. 1969).

■ In determining whether the findings are supported by substantial evidence, it is necessary to examine the evidence. As to Lakeview Christian School there is only hearsay evidence although there is a written statement made by a School Board investigator that the school "will not accept blacks." (R.229). HEW asked the School Board to undertake an investigation of the various schools in the fall of 1971; the result of the investigation as to Lakeview Christian School was that statement. The investigator was not present at the hearing and the statement cannot be construed as an admission of a party. As to Gold Coast Christian School an HEW representative, Dr. Henderson, testified that the school refused to supply any information and that on November 12, 1971 he visited the school site and saw only white children, staff and parents.[2] Again, this testimony by itself proves nothing nor does it lend the necessary support to the other hearsay testimony. The testimony as to Dade Christian School largely consists of second-hand verbal communications plus two written statements received into evidence. The first is contained in the brochure describing the school and states that "Dade Christian School, as a private institution, reserves the privilege of setting and maintaining its own standards of student conduct, dress, cleanliness and scholarship. The school maintains the right to refuse admittance to anyone it so chooses and . . . [t]he administration also reserves the right of not defining the criteria or reason when applications are not accepted." Although the brochure may cause one's ears to perk up, the hearsay statement is at best on

---

2. At Gold Coast Christian School the witness drove "past the school twice, slowly" and observed one school bus and approximately ten automobiles arrive. In other businesses this is scorned as a "windshield appraisal." At Dade Christian School he drove past and saw thirty-five or forty (students).

This witness is not a lower echelon employee but the Director of Education Division, the Office for Civil Rights, Department of HEW.

the fringes of materiality. The brochure also spells out a rigid dress and behavior code.

Ms. Vandervalk testified that she went to the school twice; on the second visit, which was on the morning of the hearing, the receptionist gave her a card bearing the name of the school and stating "We are very sorry . . . but the policy of the school is one of nonintegration and we would request that you respect this policy. School Administration." The court has the highest respect for Ms. Vandervalk's credibility, but again the undated card is purely hearsay. No official of the Dade Christian School or any other school was present in court to testify.

It must be noted that HEW does not have subpoena powers for its compliance hearings and this creates the necessity for the introduction of hearsay which would not be admissible into a court of law. However, there is no bar to HEW's introducing evidence other than hearsay. It is tempting to the court to conclude that such a huge volume of credible, strong evidence, albeit hearsay, should be considered as "substantial evidence" sufficient to affirm the Commissioner.[3] However, under the cases cited previously the court must find that the evidence before the hearing examiner was not substantial evidence to justify his finding that the School Board had sold property to schools which discriminated on the basis of race.

### FACULTY ASSIGNMENT RATIOS

In its application the School Board indicated that it would keep the imbalance to a minimum of 12 black teachers. The hearing examiner found that this "assurance" by the School Board was done by a slide rule and bore no relation to the actual teacher assignments which was off 234 black teachers. HEW based its computation on a countywide ration of 22% black elementary teachers, 16.-

9% black middle school teachers and 11.-8% black high school teachers. An examination of the application's statistics for senior and junior high schools shows the Board used a percentage for black teachers of slightly more than 20%. HEW's use of a substantially different ratio mathematically compelled a conclusion of noncompliance. This discrepancy was not explained anywhere in the record.

HEW called Mr. Snow, a civil rights specialist at HEW who had made the examination of the teacher assignment forms required annually on October 15th. He testified that HEW sometimes accepts a five percent deviation rather than adhering to the maximum deviation of two teachers per school. The court notes that if the five percent rule were applied in the instant case, nearly all of the schools would be in compliance.

The hearing examiner found that this ". . . violation [of faculty assignment ratios] in this case cannot be cured." The basis for such conclusion does not appear and is contrary both to the law and the evidence. Faculty imbalances are cured constantly, whether by court order, or by School Board adjustments to compensate for attrition, transfer or whatever reason. The hearing examiner was, perhaps, disgusted with the vagueness of School Superintendent Willis' assurance that the imbalance of the faculty assignments would be cured before the start of the second semester.

Mr. Snow testified unequivocally that the objection to the assignment of school teachers in Broward County was curable. He also suggested the formula for doing it: reassigning teachers. This is the only evidence in the record on whether the matter of faculty assignments is "curable." He further testified that the HEW officials told the Broward County School officials they could have until the beginning of the second semester to make such reassignment. (R.

---

3. There is much of the hearsay evidence that would be inadmissible in a court on additional bases. E. g. R.149, 150 of the transcript. Its probative value is nil.

247). The hearing was held on January 12th and 13th, 1972, prior to the second semester.[4]

At the time the application was prepared school wasn't yet in session. Shifts occur in teacher assignments after schools are opened because the number of students in various courses is not as anticipated.[5] Mr. Snow from HEW freely agreed with this. For example, if a school were two teachers below the ratio and then an additional teacher of that race died or moved away or became incapacitated, the school would instantly be out of compliance with *Singleton*, the two-teacher deviation rule. Clearly, the imbalance would have to be corrected by reassignment within a reasonable time.

Finally, the *Singleton* case was the law of this circuit and could have been enforced at any time upon a motion in the U. S. District Court.

For the hearing examiner to conclude the faculty assignment violation "cannot be cured" defies not only the law and evidence but also common sense.

■ This court specifically holds that the hearing examiner's finding that the faculty assignment is a violation "that cannot be cured" is arbitrary, capricious and not in accordance with the law and also that it is unsupported by substantial evidence.

At this point the court must pause to suggest that it would have been more appropriate for HEW to file a petition before the U. S. District Court to compel compliance under *Singleton*. Unques-tionably, HEW could proceed with a compliance hearing, as it did.

Broward County schools have been under a federal court's desegregation order originally entered by the late Judge Cabot; jurisdiction was retained and was subsequently transferred to Judge Atkins of this court. It is a specific holding of the U. S. Court of Appeals for the Fifth Circuit that when a school district is under a court desegregation order the racial composition of a faculty shall be substantially the same as the ratio for the teachers of the entire school system.[6] Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1218 (5th Cir. 1970). Consequently, if the school faculties did not comply with the requirements of *Singleton*, it was a simple matter to file a petition before Judge Cabot or Judge Atkins. Unques-tionably compliance would have been ordered.

## ADDITIONAL OBSERVATIONS

Unfortunately, the record before the hearing examiner does not give the real flavor of this case. HEW, evidently smarting under the criticism of a General Accounting Office report[7] that it was lax in its approval of the 1970–71 ESAP grants, pursued the alleged violation of assurances by the Broward County School Board with vigor. The lengthy application filed by the School Board was prepared in considerable haste because of deadlines set by HEW. On July 26, 1971, the School Board was advised it was a school system eligible for

---

4. This is implicit in Supt. Willis' testimony. In addition, this court can take judicial notice that the second semester did not begin until two weeks after the hearing on which the examiner based his findings and conclusions.

5. As it turned out, the school population growth decreased from an average of 6,000 per year to approximately 1,800 for the school year 1971–72 and the Broward school system had to reduce its teacher allocation by 250 teachers. This is not in the record but in Cong.Rec.—Senate, Feb. 29, 1972, p. S 2878.

6. This is almost exactly the language utilized by HEW in its regulation and cited as 45 CFR § 181.6(a)(4)(VI).

7. This and other statements in this section which are not found in the record before the hearing examiner are readily reviewable in the Congressional Record—Senate, dated Feb. 29, 1972, p. S 2877 et seq. Inexplicably, these matters were not brought to the attention of the hearing examiner. One must also wonder at how the School Board knew in February it would lose so decisively when the hearing examiner's findings and conclusions were not released until April 25, 1972.

priority one consideration for ESAP funds in 1971–72. A meeting was held in Atlanta on July 28th to discuss the matters concerning such application. The applicants were advised that in order to be considered with the first group of applicants and have early priority, that the application must be in Atlanta by August 13, 1971. The School Board necessarily had to prepare the application, secure the approval of the Bi-racial Committee, the School Board, the State Commissioner of Education and the Governor. On August 11th HEW advised the School Board of further instructions and the application was revised and delivered in Atlanta on the deadline of August 13th.

On November 8th a review team arrived from Atlanta and Washington and apparently the School Board cooperated fully with that review team.

There is some reason to believe that the School Board brought the matter to the attention of the federal court.[8] In fact, on October 4, 1971 a status report was filed by then Assistant Superintendent Drainer in the U. S. District Court case in which Judge Cabot had entered the desegregation order for the Broward County Schools. Unfortunately, this pleading is not available to the court as the court is advised that it was destroyed in a fire in the Clerk's office at the Fifth Circuit Court of Appeals. Apparently no motion or petition for court action was included in the report. The docket record for the file indicates no further pleadings were filed in the case until the assignment of the file to Judge Atkins after the untimely death of Judge Cabot on December 4th, 1971.

The critical matter not presented to the hearing examiner which adds more than mere flavor to this case was the amendment offered by Sen. Chiles when the Senate was considering the amendment to the appropriations act funding ESAP for the school year 1972–73. His amendment[9] provided that a school board could apply for a waiver which "shall be granted by the secretary [of HEW] upon determination that any practice, policy, procedure or other activity resulting· in ineligibility has ceased to exist, and that the applicant ·has given satisfactory assurance that [the activities prohibited in sub-section (d)][10] will not reoccur." The ban on the sale of property to nonpublic schools practicing discrimination was proposed to the 1971–72 ESAP appropriation by Sen. Mondale and was known as the "Mondale Amendment." Sen. Mondale urged the support of this amendment to the "Mondale Amendment" because it would " . . . assure that a harsher remedy than any of us intended is not included in these cases." Cong.Rec.—Senate, Feb. 29, 1972, p. S. 2877.

It is clear that the amendment has been applied in a "harsher" manner than intended by the drafter of the amendment.[11] Apparently the Commissioner of Education was not aware of this opinion by Sen. Mondale. The "harshness" is obvious: an administrative oversight in the sale of $4,612 worth of surplus desks and school supplies could deny the school children of this county $1,737,000 in needed funds. Among numerous other purposes, these funds would have been used to cover busing costs and to hire 87 additional reading teachers and 73 teacher aides to assist in reading.

If this court had the luxury of sitting as a court of equity in this matter, the

---

8. This matter is rather unclear because at the top of column 1, p. S 2879 of the Congressional Record for Feb. 29th, 1972, the explanation is given that the presiding judge of the "circuit" court was asked by the School Board attorney if he was interested in looking over the transfer and changes. The court assumes that means the U. S. District Court rather than the U. S. Court of Appeal.

9. Cong.Rec.—Senate, Feb. 29, 1972, p. S. 2877, col. 2

10. This clarifying amendment was suggested by Sen. Javits, Cong.Rec.—Senate, Feb. 29, 1972, p. S. 2877, col. 3

11. The "Mondale" amendment created special problems for school boards in Florida which must dispose of surplus property by sale. Fla.Stat. § 235.04.

inequitable result arrived at by the U. S. Commissioner of Education would be summarily set aside.

## CONCLUSION

For the reasons stated earlier the decision of the Commissioner terminating the 1971–72 ESAP grant and the ordering of repayment of funds already received under it is reversed.